**READING INDUSTRIES, INC., Readi-Fin Manufacturing Company, Inc., and Reading Metals Refining Corporation, Plaintiffs,**

v.

**KENNECOTT COPPER CORP., Chase Brass & Copper Co., Inc., Phelps Dodge Corp., Phelps Dodge Industries, Inc., Successor to Phelps Dodge Copper Products Corp., the Anaconda Co., and Anaconda American Brass Co., Defendants.**

**No. 71 Civ. 1736.**

United States District Court, S. D. New York.

Sept. 26, 1979.

As Amended Nov. 26, 1979.

---

Kohn, Milstein & Cohen, Washington, D. C., for plaintiffs; Harold E. Kohn, Jerry S. Cohen, Michael D. Hausfeld, Washington, D. C., of counsel.

Sullivan & Cromwell, New York City, for the Kennecott and Chase defendants.

Debevoise, Plimpton, Lyons & Gates, New York City, for the Phelps Dodge defendants.

Chadbourne, Parke, Whiteside & Wolff, New York City, for the Anaconda defendants.

LASKER, District Judge.

Reading Industries, Inc., refines copper scrap and manufactures copper tubing. Defendants Kennecott Copper Corporation, Phelps Dodge Corporation, and The Anaconda Company, are large, vertically integrated firms which mine, mill, smelt, and refine copper. Together they produce about sixty percent of the refined copper used each year by the nation's copper fabricators, who transform refined copper into intermediate products such as copper wire, rod, sheet, and tubing. Each of the producing defendants also owns its own fabricating subsidiaries, some of which are named as defendants.

In this suit for treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, Reading charges that between 1964 and 1970 Kennecott, Phelps Dodge, and Anaconda conspired to fix the price of domestically produced refined copper and to monopolize the market for the sale of domestically produced refined copper, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Amended Complaint ¶¶ 40–42;[1] Defendants' Brief, Appendix A (letter of May 14, 1979 from plaintiffs' counsel to the court).

The defendants move on three grounds for summary judgment dismissing the complaint. First, they assert that the action must be dismissed on its merits because, despite extensive discovery over eight years, Reading has failed to produce any "significant probative evidence tending to support the complaint." *First National Bank v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). Second, they argue that under the rule of

---

1. This complex antitrust case was initiated in 1971 but pretrial motions and skirmishes delayed in-depth discovery until about 1977. As a result of that discovery, plaintiffs advised that their theory of the case was radically altered. So different was the plaintiffs' present theory from that articulated in the original complaint that the court ordered the plaintiffs to file with it and defense counsel a "Statement of Contentions." That statement is dated August 29, 1977. After its receipt the court ordered the plaintiffs to propose an amended complaint. That document is dated July 9, 1979. By letter of July 18, 1979 defense counsel objected to certain portions of the amended complaint as inadmissible under the Federal Rules of Civil Procedure. The court invited plaintiffs to respond to the defendants' letter, which the plaintiffs did by a voluminous response dated July 31, 1979. Defense counsel answered the response by detailed letter of August 6, 1979.

In a separate ruling of this date, we have sustained the defendants' objections to (1) inclusion in the amended complaint of material expanding the scope of conspiracy to include co-conspirators not named as defendants and (2) inclusion of material relating to alleged fraudulent concealment of the conspiracy. Moreover, we have specified that allegations increasing damages from $18,000,000. to $61,000,000. must be particularized. The information contained in this note is given as background. Our ruling dismissing the complaint would not be different if the proposed amended complaint were accepted as tendered.

*Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), Reading cannot maintain this action. Finally, they contend that Reading lacks standing to sue under section 4 of the Clayton Act "both because [it] was not a 'target' of [the alleged] conspiracy and because its claimed injury is too remote and indirect to sustain standing." (Defendants' Brief at 4.)

## I. The Copper Market[2] and the Theory of Reading's Case

There are two sources of copper—virgin ore and scrap. Primary production of domestic copper—that is, production of copper from domestically mined ore—is dominated by the defendants, who control sixty to seventy percent of domestic mine production and have augmented their mining hegemony by forward integration through the various phases of copper production, developing substantial smelting, refining, and fabricating capacity. Secondary copper production—the recovery of copper scrap—consists of two elements: recirculation of "new" scrap (defective castings, clippings, punchings, turnings, borings, skimmings, drosses, slags, and other scrap generated in the course of manufacturing copper items) and "old" scrap (obsolete, damaged, or discarded articles such as old pipe, spent cartridge casings, automobile radiators, and lithographic plates). Much new scrap is apparently returned by manufacturers directly to the copper fabricator from which the copper sheet, wire, rod, or tubing used in the manufacturing process was originally purchased, and does not pass through the "scrap market." Old scrap, and whatever new scrap does enter the market, is collected by several hundred scrap dealers or merchants who accumulate it and sell it to smelters and refiners.

During the period 1964 to 1970 there were three significant pricing systems for copper. The first was that employed by the major domestic producers, including Kennecott, Anaconda, and Phelps Dodge (and, until 1966, by many foreign producers), who quoted a non-negotiated price (known in the industry as the "producers' price") which remained in effect until a new price was quoted. Between 1964 and 1970, all the major domestic producers quoted identical prices, and any price change announced by one producer was, for all practical purposes, immediately matched by the others. The second pricing system was the London Metal Exchange (LME). The LME is primarily a hedgers' or speculators' market, seldom used to secure the actual delivery of copper. Its importance lies in the fact that many smaller producers, (and the major foreign producers after they abandoned the producers' price in 1966), based their prices on the LME quotations. The third pricing system was the scrap market, which consisted of several hundred independent dealers whose prices, according to Reading, were "tied to, tracked and established in the open market relative to the LME price." (Amended Complaint ¶ 31.) Reading alleges that the LME and the scrap market were "open markets," which Reading defines as "competitive pricing mechanisms for copper established by buyers and sellers as a function of supply and demand, including, but not limited to, the LME, the New York Commodity Exchange ("COMEX"), and the dealers market for scrap." *Id.* ¶ 28.

Reading further alleges that "[d]uring the period 1964–1970, the U.S. producers' price, the LME price and the scrap price were interrelated, and [that] under competitive conditions, the U.S. producers' price should have approximated the LME price." *Id.* ¶ 32. In fact, however, between 1964 and 1970 the producers' price was well below the LME price: during this period, refined copper sold by Kennecott, Phelps

---

**2.** The discussion of the copper market in this section of the opinion is based primarily on the descriptions in the parties' briefs on this motion and on Y. Levy, Copper: Red Metal in Flux 53–54 & passim (1968) (Federal Reserve Bank of San Francisco Monthly Review Supplement), and A. McMahon, Copper, A Materials Survey 253–55, 259–60 & passim (1964) (U.S. Bureau of Mines Information Circular 8225), which were submitted to the court by the defendants, and the opinion of the court in *United States v. Amax,* 402 F.Supp. 956 (D.Conn.1975), which is cited by the plaintiffs.

Dodge, and Anaconda (at the producers' price) was considerably cheaper than refined copper available from other sources, including independent refiners and scrap dealers. Reading alleges that this was so only because the defendants conspired to keep the producers' price low, and that in furtherance of this conspiracy they chose to ration their available copper among favored customers rather than raise their prices to clear the market. The defendants acknowledge that each of them could have charged higher prices without losing sales in the short run, and that each of them did ration supplies among its customers, but they argue that each acted independently in refraining from raising its prices, in order to protect long term sales. In short, they argue that their conduct, though parallel, was non-collusive. If this is so, they are not accountable under the law for the effects of their actions, no matter how adverse to others. If, on the other hand, as Reading charges, the defendants' pricing behavior reflected a "contract, combination, or conspiracy" to restrain trade, or monopolize a market by fixing prices, they violated the Sherman Act. *See Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); L. Sullivan, Antitrust Law 210–13 (1977).

■ To prevail in this suit, however, Reading must establish not only that the defendants violated the antitrust laws, but also that Reading was injured "by reason of" their violation. 15 U.S.C. § 15. Reading does not contend that as a consequence of the defendants' pricing behavior it was injured in its capacity as a copper refiner. Rather, it alleges that it was injured as a purchaser of copper for its fabricating operations. Reading did not purchase copper from the defendants, nor could it allege injury if it had, since the gravamen of its complaint is the claim that the defendants sold copper at artificially low prices. Reading purchased copper primarily from scrap dealers, and the basis for its claim of injury is that because the defendants held down the price for their refined copper, which constituted about sixty percent of the refined copper available in the domestic market, the price for the other forty percent of the available copper, including the price for the copper scrap which Reading purchased, rose to artificially high levels. That is, Reading contends that it was injured because, as a direct result of the alleged conspiracy by the defendants to maintain a low producers' price for copper, it was forced to pay more for the copper scrap it purchased from scrap dealers than it would have had to pay in the absence of the conspiracy.

Despite Reading's voluminous submissions on this motion, it is not entirely clear what Reading considers to be the underlying economic mechanism responsible for the alleged effect of a low producers' price on "open market" copper prices.[3] The Report

---

**3.** In ¶ 44 of the Amended Complaint, Reading alleges:

"44. The aforesaid combinations and conspiracies in violation of Sections 1 and 2 of the Sherman Act had the following effects among others:

"a. Created a gap between the U.S. producers' price and the price of copper traded on open markets in which the U.S. producers' price was for the period 1964–70 significantly lower than the price of copper prevailing on the open markets during the same period;

"b. Caused dislocations in the normal supply and demand relationships in the copper market and corresponding hardships for domestic fabricators, including Reading, and

resulted in distortions in the domestic copper market;

"c. Resulted in an artificially low U.S. producers' price which in turn caused the price for copper prevailing on open markets, including the dealer market for scrap, to reach artificially high premium levels. This would not have occurred but for the artificially maintained, low U.S. producers' price;

"d. Created an artificial demand for, and shortage of, U.S. producers' price copper and forced domestic fabricators, such as Reading, to purchase their requirements of copper at the artificially high open market prices;

"e. Created a substantial disparity in the raw material costs of copper for domestic fabricators by allocating lower U.S. producers' price copper to preferred and selected

of Plaintiff's Economic Expert, submitted as an addendum to Reading's brief in opposition to the present motion, states that:

"The defendants' maintenance of an artificially low price for refined copper had three important consequences for the copper markets: (a) the defendants rationed the supplies of domestic copper that were 'available' at the producer price; (b) some semifabricators, who historically had derived a large percentage of their copper from the defendants, experienced a serious shortage; and (c) the demand for copper that could not be satisfied by the defendants spilled over into other markets, causing the prices to rise in those markets." [4]

The critical predicate of Reading's economic argument appears to be the fact, accepted by the defendants (at least for the purposes of this motion), that in order to maintain the low producers' price in the face of excess demand for copper at that price, the defendants rationed their supplies of copper.[5] As a consequence, fabricators who did purchase refined copper from the defendants at the producers' price were not able to purchase as much copper as they might have wished. Reading's argument appears to be that when these fabricators turned to alternate domestic sources, such as the scrap market, to purchase the complement of their needs, they were willing and able to bid up the price of copper available from those alternate sources precisely because they had secured a portion of their requirements at the low producers' price.[6] In short, Reading argues that these fabricators were able to pay, and did in fact

pay, a premium price for the copper they purchased from alternate sources, such as scrap dealers, because they had realized savings on their purchases of relatively cheap copper from the defendants, that as a consequence the price for scrap copper rose to a higher level than it would have had the defendants not held the producers' price low, and that Reading was injured as a result to the defendants' allegedly illegal action.

Although the defendants do not agree with Reading's assertion that "open market" prices for copper, including the price for copper scrap, rose to higher levels than they otherwise would have had the defendants not held their prices for refined copper low, they do not dispute it on this motion. Rather, they take the position that even if Reading's analysis is correct, they are entitled to summary judgment dismissing the complaint. We have discussed Reading's thesis only because any consideration of the second and third branches of the defendants' motion for summary judgment requires an understanding of the purported causal link between the alleged antitrust violation and Reading's alleged injury. For the purposes of this motion, then, we assume that (whatever Reading's precise economic argument may be) Reading and the other firms that did not have access to the defendants' copper did pay more for copper than they would have had the defendants not held their prices at levels which failed to clear the market.

## II. Evidence of Combination or Conspiracy

Acceptance of Reading's assumption, however, does not end the matter. To pre-

---

customers of the Defendants while forcing the remainder of the domestic fabricators, such as Reading, to purchase their copper requirements at the artificially higher open market prices; and

"f. Had the direct effect of limiting competition by smaller U.S. mine producers by restricting the amount of copper that would have been available but for the artificially low U.S. producers' price."

**4.** Addendum to Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment, Report of Plaintiffs' Economic Expert at 94.

**5.** In ¶ 43 of the Amended Complaint, Reading alleges that

"[i]n formulating and effectuating [the alleged conspiracy], Defendants . . .

(i) Allocated the available output of refined copper production to preferred customers;
. . . ."

**6.** *See* Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment at 393 ("[C]ertain United States fabricators, having substantial allocations of lower U.S. producers' priced copper, could afford to and did 'bid-up' the price on the open markets.").

vail in this action Reading must prove not only that it was injured because the defendants held the producers' price at an artificially low level, but also that in doing so the defendants violated the antitrust laws. Reading's theory of causation purports to explain only how the market translated a low producers' price into a high scrap price—it says nothing as to how the low producers' price came about in the first place. Only if the defendants acted collusively are they liable under the Clayton and Sherman Acts. They argue that they are entitled to summary judgment dismissing the action on the merits because there is no evidence suggesting that they acted in concert or otherwise violated the antitrust laws in connection with their pricing decisions.

■ It is a legal commonplace that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (footnote omitted). This is the paradigm of cases to which the Supreme Court's admonition is addressed. The historical facts here are not in dispute: the defendants do not deny that they quoted identical prices for refined copper, and resisted "market pressures" to raise their prices. The key, indeed the sole, issue, is whether in doing so they acted jointly or independently. Thus, proof that the defendants violated the antitrust laws will not turn on what happened, but rather on why it happened. Nonetheless, the defendants contend that this is a case in which summary judgment dismissing antitrust claims on the merits is warranted.

■■ The rule is that if the party moving for summary judgment shows conclusively that the factual allegations of the complaint are not susceptible of any interpretation suggesting that the defendants violated the antitrust laws, the opposing party may not rely on those allegations, but must produce "significant probative evidence tending to support the complaint" if it is to avoid summary dismissal of the action. *First National Bank v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *United States v. Pent-R-Books*, 538 F.2d 519, 529 (2d Cir. 1976); *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102, 110–11 (2d Cir. 1975); *Weit v. Continental Illinois National Bank and Trust Co.*, 467 F.Supp. 197, 208 (N.D.Ill. 1978). The defendants argue that application of this rule requires summary dismissal of this action. However, their argument does not carry the day. Summary judgment is not appropriate here because the defendants have not shown that Reading's factual allegations will not support an inference that the defendants violated sections 1 and 2 of the Sherman Act. Moreover, as indicated below, Reading has come forward with evidence which does tend to support its contention that the defendants violated the antitrust laws, evidence which would suffice to defeat this branch of the defendants' motion even if the defendants had met their initial burden.

The defendants have concentrated their efforts on demonstrating that each of them had legitimate reasons to hold down the price of copper. While this may be so, the question is not whether the defendants had legitimate reasons for their action, but whether they acted in concert, and here the legitimate business reasons which the defendants suggest motivated their actions do not defeat the possibility that the defendants acted collusively. The defendants have submitted extensive evidence that during the period in question—1964–1970— each of them was concerned that high copper prices would lead their customers to substitute other materials (such as aluminum or plastic) for copper; each was under government pressure (in the form of jawboning) to keep prices down to curb the inflation spawned by the Vietnam war, and each was subject to leverage from large customers who frowned on price increases. This showing, however, does not exclude possible inferences of combination or conspiracy; it simply suggests alternate incen-

tives to conspire. That each of the defendants had independent motives for holding the price of copper down does not negate the possibility that they acted together to effect them. Despite the volume and quality of the defendants' submissions on this point, they have failed to demonstrate that the undisputed facts are not susceptible to the interpretation that they violated the Sherman Act.

Because of their failure to do so, Reading was under no compulsion to come forward on this motion with evidence in support of its claims. Nonetheless, Reading has identified a number of factors which dictate that summary dismissal of its complaint would be inappropriate even if the defendants had made the conclusive showing required by *First National Bank v. Cities Service Co.* In particular, Reading points to the undisputed structural characteristics of the copper market and the defendant firms, and argues that inferences of combination and conspiracy sufficient to defeat the defendants' motion for summary judgment can be drawn from these alone. In a highly concentrated, vertically integrated, interdependent industry protected from outside encroachment by enormous startup costs and limited supplies of the basic commodity (copper ore), opportunities for collusion are extensive and the potential benefits to be realized great. When there is in addition evidence, as there is here, of consciously parallel conduct, as well as evidence of common motives for such conduct, strong inferences of collusion are permissible.[7] At trial the jury might or might not find such inferences compelling, but on this motion for summary judgment, Reading is entitled to the benefit of those inferences.[8]

In sum, even the defendants' view of the facts does not undercut Reading's allegations of conspiracy, and in addition Reading has adduced evidence "tending to support" them. Accordingly, this branch of the defendants' motion for summary judgment must be denied.

### III. The *Rule of* Illinois Brick Co. v. Illinois.

■ As an alternate ground, the defendants urge that Reading's suit must be dismissed under the rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). In addressing the defendants' argument on this point, it is important to distinguish between the Supreme Court's holding in *Illinois Brick* and the rationale which the Court expressed for its holding. The holding of *Illinois Brick* was that, with a few exceptions, an indirect purchaser cannot maintain an action against a price-fixer to recover overcharges passed on to the indirect purchaser as the price-fixer's product moved through the chain of distribution. To state this holding is to demonstrate that it has no application to the facts of this case, which does not involve overcharges, indirect purchasers, or a vertical chain of distribution linking plaintiff and defendant. To apply the rule of *Illinois Brick* to the circumstances of this case would be to transmute the decision beyond recognition.

However, although the *rule* of *Illinois Brick* has no application to this case, the *rationale* for the rule has direct relevance.

There were two grounds for the Supreme Court's decision articulated in *Illinois Brick.*

---

7. *See Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954); *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); R. Posner, Antitrust Law: An Economic Perspective (1976); L. Sullivan, Antitrust Law 354–64 (1977); Turner, Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655 (1962); First, Book Review, 52 N.Y.U.L.Rev. 947 (1977).

8. "[A]ll of the evidence . . . does not point in one direction and different inferences might reasonably be drawn from it . . . [I]t is the jury which 'weighs the contradictory evidence and inferences' and draws 'the ultimate conclusion as to the facts.'" *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 700–01, 82 S.Ct. 1404, 1411, 8 L.Ed.2d 777 (1962) (quoting *Tennant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944)).

The first was the need to foreclose the possibilities of multiple recovery against defendants that might ensue were indirect purchasers permitted to sue on a "pass on" theory. In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the Court had held that an alleged price-fixer could not interpose as a defense to a treble damages action brought by a direct purchaser the claim that the plaintiff had suffered no injury because it had passed on to its own customers any illegal overcharges it paid. If the rule of *Hanover Shoe* were to continue unchanged, and indirect purchasers were nonetheless allowed to sue on a pass on theory, defendants would find themselves liable to direct purchasers for the entire amount of any overcharge paid by that purchaser, and also liable to indirect purchasers for that portion of the overcharge that was passed on to them. To avoid such multiple liability, the Court chose to bar suits by indirect purchasers rather than modify or overrule its earlier holding in *Hanover Shoe.*

In determining whether or not to modify its earlier holding, the Court reexamined the grounds for the *Hanover Shoe* decision, and concluded that the "principle basis for the decision in *Hanover Shoe*,"—the

> "perception that the attempt to trace the complex economic adjustments to a change in the cost of a particular factor of production would greatly complicate and reduce the effectiveness of already protracted treble-damage proceedings"—

applied with equal force in the circumstances of *Illinois Brick*, since it is no easier for a plaintiff to demonstrate how costs filter through a chain of distribution than it is for a defendant. 431 U.S. at 731–32, 97 S.Ct. 2061 at 2068. This was the second, and more crucial, ground for the Court's decision in *Illinois Brick.*

The perception that efforts to analyze and explicate the vagaries of the marketplace must necessarily create enormous difficulties in the trial ·and decision of antitrust suits is markedly relevant here, where the core of Reading's case—the link be-

tween the alleged antitrust violation and the injury Reading claims it suffered because of that violation—is an economic theory about the reverbations in one part of the copper market caused by a constraint in another part of that market. Trial of this case would surely involve "the uncertainties and difficulties in analyzing price and output decisions 'in the real economic world rather than an economist's hypothetical model' and . . . the costs to the judicial system and the efficient enforcement of the antitrust laws of attempting to reconstruct those decisions in the courtroom," 431 U.S. at 731–32, 97 S.Ct. at 2068 (footnote and citation omitted) (quoting *Hanover Shoe*, 392 U.S. at 493, 88 S.Ct. 2224), which it was the Supreme Court's central concern to minimize in *Illinois Brick*. While this alone is not enough to warrant extension of the narrow holding of *Illinois Brick* to circumstances radically different from those to which it was addressed, it does counsel special sensitivity to the difficulties and dangers inherent in attempts to trace the causal link between economically remote antitrust violations and injuries. Such sensitivity is crucial to an adequate consideration of the final branch of the defendants' motion, which raises the question whether Reading has standing to sue for treble damages under section 4 of the Clayton Act. *See Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 582–87 (3d Cir. 1979).

## IV. Standing

Section 4 of the Clayton Act provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may sue to recover "threefold the damages by him sustained." 15 U.S.C. § 15. As the Supreme Court has noted, however, the federal "courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n. 4, 92 S.Ct. 885, 881 n. 14, 31 L.Ed.2d 184 (1972). The decision in *Illinois Brick*,

for example, is one instance in which the Supreme Court has recognized limits to the right to sue for damages based on injuries sustained, at least in part, because of a violation of the antitrust laws. More generally, the lower federal courts have acknowledged such limits in formulating rules limiting plaintiffs' standing to sue for treble damages under section 4.

■ The reasons for these rules have been thoroughly canvassed. *See, e. g., Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292, 1295 (2d Cir. 1971) *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972); Berger & Bernstein, An Analytical Framework for Antitrust Standing, 86 Yale L.J. 809, 845–58 & passim (1977). By limiting the availability of the treble damage remedy, the courts seek to limit the potential for multiple recoveries, to avoid disproportionate damage awards that threaten to debilitate or ruin defendants (with possible anticompetitive effects), to curb *in terrorem* suits that encumber the judicial infrastructure, and to minimize the difficulties and speculation encountered at trial in the proof of injury and calculation of damages. In general, the courts have restricted standing to those whose injury is, to a greater or lesser degree, a "direct" consequence of the alleged antitrust violation. The difficulty in each case, of course, lies in discriminating with precision between "direct" and "indirect" injury.

The rule in the Second Circuit is that "a plaintiff must allege a causative link to his injury which is 'direct' rather than 'incidental' or which indicates that his business or property was in the 'target area' of the defendant's illegal act." *Billy Baxter, Inc. v. Coca-Cola Co.,* 431 F.2d 183, 187 (2d Cir. 1970) *cert. denied,* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971). Though the Second Circuit has sought to elucidate this standard in a number of cases, the line delimiting the "target area" of an antitrust violation has not yet been definitively drawn, and indeed may not be capable of precise definition.[9]

**9.** For a recent discussion of the Second Circuit's antitrust standing decisions, see *Laurie*

In *Billy Baxter,* the plaintiff, who franchised independent bottlers of a line of soft drinks, charged various manufacturers of competing soft drinks with violating the antitrust laws in an effort to drive the plaintiff's franchisees out of business. The plaintiff alleged that as a consequence its franchisees' profits had been reduced, and its own revenues had suffered accordingly. The court concluded that the franchisor did not have standing to sue because it was "one step removed from the link in the production-distribution chain receiving the first impact of the alleged misconduct." *Id.* at 188.

In a subsequent case, *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292 (2d Cir. 1971) *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972) the rule was extended. There the plaintiff rented theatres to the defendant, a motion picture exhibitor. The complaint charged the plaintiff's tenant with conspiring with others to restrain the trade of competing motion picture distributors and exhibitors, and asserted that in furtherance of the conspiracy the tenant exhibited less profitable films in the theatres it rented from the plaintiff than it otherwise would have. This indisputably injured the plaintiff because the rent paid was based in part on the tenant's gross receipts. Nonetheless, the court held that the landlord did not have standing:

> "[T]his court has committed itself to the principle that in order to have 'standing' to sue for treble damages under § 4 of the Clayton Act, a person must be within the 'target area' of the alleged antitrust conspiracy, i. e., a person against whom the conspiracy was aimed, such as a competitor of the persons sued. Accordingly we have drawn a line excluding those who have suffered economic damage by virtue of their relationships with 'targets' or with participants in an alleged antitrust conspiracy, rather than by being 'targets' themselves."

*Visual Etudes, Inc. v. Chesebrough-Pond's Inc.,* 473 F.Supp. 951 (S.D.N.Y.1979) (Weinfeld, J.).

*Id.* at 1295. The court noted that a "line which limits standing to those against whom the antitrust violation is directed . . . establishes a reasonable and easily identifiable cut-off that avoids the unfortunate consequences of opening the floodgate to all, no matter how remote their interest or incidental their relationship," *id.* at 1296 (footnote omitted). Subsequent cases, however, and the present one, demonstrate that the "cut-off" is not always so "easily identifiable" as might be wished.

In *Long Island Lighting Co. v. Standard Oil Company of California,* 521 F.2d 1269 (2d Cir. 1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976) (*LILCO*), Judge Gibbons (siting by designation) noted that "the line between plaintiffs with standing and those who lack it may not in every case seem perfectly plain." *Id.* at 1274. In *LILCO,* the plaintiffs were two public utilities who sued three oil companies, charging that the oil companies had organized a joint boycott of Libyan oil in an effort to dissuade the Libyan government from nationalizing their oil concessions. Pursuant to the boycott, the oil companies refused to honor contracts requiring them to deliver Libyan crude oil to the independent refiner who was the plaintiffs' chief source of low sulphur heating oil. The refiner was forced to negotiate new supply contracts directly with the Libyan government, on terms less favorable than its contracts with the defendant oil companies. In addition, the oil companies refused to ship Libyan oil, and as a result the refiner incurred increased transportation costs. The refiner's increased costs were passed on to the plaintiff utilities. It is clear that the utilities' costs were increased sharply as a result of the allegedly illegal boycott of Libyan oil. Judge Gibbons noted that "[i]t was foreseeable, certainly, that in the short run this boycott would have some effect, possibly adverse, on the business or property" of the plaintiffs, but concluded that nevertheless they lacked standing to sue in the circumstances.

"[The utilities] were not the objects of the alleged antitrust violation. Their injuries were the result of their relationship to [the refiner], an intermediate non-target. The cases recognize that suppliers, stockholders, employees, landlords, franchisors, licensors, and consumers are too remote for Clayton Act standing. The instant plaintiffs, customers of a non-target, are at least equally remote."

*Id.* at 1274 (footnotes omitted).

▮▮▮ From the opinions in these cases two factors emerge as tests for the standing of antitrust plaintiffs: First, the plaintiff's status, and second, the plaintiff's proximity or remoteness from the center of the alleged conspiracy. Thus, as to status, in each case the plaintiff which was held to lack standing suffered injury which was "derivative", that is, one suffered not because of the plaintiff's role in the market but because of its status as a "creditor, stockholder, employee, subcontractor, or supplier of goods and services," *Calderone,* 454 F.2d at 1295, or something of the like (franchisor in *Billy Baxter,* landlord in *Calderone,* and customer in *LILCO*). As to proximity or remoteness, the injury of the plaintiff in the cited cases was found to be several steps removed from the immediate impact of the alleged violation.

While each of the cases touches on both of the factors mentioned, none of the opinions suggests that one or the other of the factors is a *sine qua non* to the determination that a plaintiff lacks standing. We conclude that the rule of the cases is that a plaintiff lacks standing to sue if he either fails the "status" test or the "proximity-remoteness" test. That is to say, the cases teach that if the plaintiff's status is "derivative" within the meaning of the doctrine *or* the plaintiff's position is remote from the center of the alleged conspiracy, the plaintiff lacks standing to sue. The question then is whether Reading passes both tests. We agree that since Reading's alleged injuries, no matter how remote, were suffered "in the market" as a consequence of market interactions and economic adjustments to the defendants' behavior, Reading may well have standing on the basis of the "status" test. Nevertheless, we conclude that whatever Reading's standing under the "status"

test, it does not have standing as defined by the "proximity-remoteness" test. In our view, Reading's claim that its injury was caused by the defendants holding down prices, which in turn is claimed to have raised prices on the LME and in the scrap market, which in turn required Reading to pay prices higher than it otherwise would have is too remote to fall within the "target area" as described by the Second Circuit cases. The causal chain at issue here is at least as involved and tenuous as those in *Billy Baxter, Calderone,* and *LILCO* where the plaintiffs were found to lack standing. Accordingly, we conclude that like those plaintiffs, Reading lacks standing to sue.

As was true in another recent case in which antitrust plaintiffs were found to lack standing, our conclusion is strengthened by the Supreme Court's decision in *Illinois Brick. See Mid-West Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573 (3d Cir. 1979). As noted earlier, the Court expressed in *Illinois Brick* its concern about the difficulties inherent in any attempt to prove the impact of a defendant's activities by tracing the economic adjustments and market interactions caused by those activities, and the danger of duplicative or ruinous recovery that often accompanies such attempts. Both are endemic here. Trial of this action would clearly be complicated by the necessity of pursuing "complex and conjectural economic lines of causation and effect," *id.* at 583, and the potential for duplicative and ruinous recovery against the defendants is enormous, since if Reading has standing to sue, every other individual or firm who purchased copper during the period 1964–1970 at prices artificially elevated as a consequence of the alleged price-fixing conspiracy must have standing as well. In these circumstances, a decision that Reading has standing to sue could not be lightly taken.

The subject at hand is acknowledgedly complex and the arguments in support of Reading's position are respectable. Nevertheless, we conclude that the thrust of the Second Circuit cases, supplemented by the momentum of *Illinois Brick,* dictates the conclusion that Reading lacks standing to sue. The complaint is dismissed.

It is so ordered.