TRIANGLE INDUSTRIES, INC., et al., Plaintiffs,

v.

KENNECOTT COPPER CORPORATION, et al., Defendants.

No. 71 Civ. 1737(MEL).

United States District Court, S.D. New York.

June 2, 1983.

Jerry S. Cohen, Michael D. Hausfeld, Kohn, Milstein & Cohen, Washington, D.C., for plaintiffs.

Sullivan & Cromwell, New York City, for Kennecott and Chase defendants; Michael A. Cooper, Bruce E. Clark, Richard H. Klapper, New York City, of counsel.

Debevoise & Plimpton, New York City, for Phelps Dodge defendants; Andrew C. Hartzell, Jr., Martin Frederic Evans, Jeffrey N. Drummond, Seth L. Rosen, New York City, of counsel.

Chadbourne, Parke, Whiteside & Wolff, New York City, for Anaconda defendants; Paul G. Pennoyer, Jr., Michael S. Davis, Neil E. Mellen, New York City, of counsel.

LASKER, District Judge.

Triangle Industries Inc. and Triangle PWC, Inc. ("Triangle") are fabricators of copper. In 1971 they instituted this antitrust action against the defendants, all of whom are both copper producers (suppliers) and fabricators. The allegations of the complaint are discussed below.

Simultaneously with the filing of this case, counsel for the plaintiffs instituted a companion antitrust action on behalf of Reading Industries, Inc., a refiner of copper scrap and a manufacturer of copper tubing, against the same defendants as the defendants here. Since both cases involved the likelihood—a likelihood which has become fact—of massive discovery and protracted preparation for trial, and because counsel (the same on both sides in both cases) could not simultaneously prepare or try both cases—except to the extent that much discovery material would be usable in both actions—the Court determined that the processing and trial of the Reading case should precede Triangle. After completion of discovery in Reading, the defendants moved for summary judgment. The motion was granted on the grounds that the relation of the plaintiff and its alleged injuries was so remote from the defendants' alleged acts as to disqualify the plaintiff under the Second Circuit's "target area" theory of antitrust actionability. 477 F.Supp. 1150 (1979). The decision was affirmed, 631 F.2d 10 (2d Cir. 1980), and certiorari was denied. 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981).

In view of this disposition of the sister case, and in view of some common features of the cases, as well as considerable common discovery and identical facts as to the defendants' behavior in the copper market in the period of time covered by the complaints, it might have been anticipated that the instant case would have been pursued no further, but that was not to be.

After the 1981 denial of certiorari in Reading—more than ten years after this suit was commenced—Triangle moved to amend its complaint. The most significant changes for which approval were sought was to substitute for paragraph 25(a) of the original complaint which read as follows:

"(a) [Defendants] increased the domestic producer prices of electrolytic copper wire bar, billets and rod at or about the same time, including the prices of copper to independent fabricators including Triangle. There were four such price increases in 1969, and two more in 1970"

a new paragraph 25(a) to read as follows:

"(a) [Defendants] fixed, maintained and stabilized the domestic producer prices of electrolytic copper wire bar, billets and rod at or about the same time, including the prices of copper to independent fabricators including Triangle"

and for the original subparagraph 25(d) which read as follows:

"(d) [Defendants] subjected independent fabricators, including Triangle, to a price-squeeze, by continually increasing the price of copper to such fabricators, while at the same time charging prices for defendants' own copper fabricated products which do not properly reflect the increase in the price of copper, making it impossible for independent fabricators to reflect in the prices of their own products the increase in their raw material cost. To achieve this result defendants

have, among other things, granted substantial discounts from their published price lists for fabricated products; afforded price protection to customers for their fabricated products without granting corresponding price protection to independent fabricators on the price of copper; and failed to duly reflect their increased copper prices in the price lists for their fabricated products"

a new subparagraph 25(d) to read as follows:

"(d) [Defendants] fixed, maintained and stabilized the price of copper fabricated products by not properly reflecting the price of copper utilized in such products, making it impossible for independent fabricators to reflect actual raw material costs in the prices of their own copper fabricated products. To achieve this result, defendants afforded price protection to customers for their fabricated products and concertedly priced their fabricated products at levels which did not reflect the marginal cost per unit. This conduct was directly contrary to the economic self-interest of each."

The motion to amend was denied on the grounds that the proposed new language not only would not clarify the original allegations of the complaint—as the plaintiffs argued—but "because a reasonable construction of the amendments leads to the conclusion that they in fact would alter plaintiffs' theory of the case." (Opinion of November 25, 1981). In denying the motion to amend we pointed out that, for example:

"The original claim was that of a price squeeze caused by continual price increases effected simultaneously by the defendants. The new claim eliminates reference to price squeezes and to price increases. The original charged that the defendants' acts made it impossible for independent fabricators to reflect in the prices of their own products the increase in the raw material costs. The proposed revision charges that the defendants' acts made it impossible for independent fabricators to reflect actual raw material costs (without·reference to any increase). The

original makes no reference to the defendants' concerted pricing of fabricated products or to the defendants' marginal cost per unit."

In sum, we held that plaintiffs proposed to prove a different case from the one alleged in the complaint, and that, in spite of the policy that amendment of pleadings be freely granted (Rule 15(a), Fed.R.Civ.Pr.) "it would not be in the interests of justice to permit amendments which alter, if they do not indeed contradict, previous claims and which consequently prejudiced the defendants by requiring them eleven years after the complaint was filed, to defend against new claims."

The defendants now move for summary judgment dismissing the complaint on the grounds that the plaintiffs have abandoned and expressly repudiated the claims asserted in the complaint either by explicit withdrawal of the claims or by contradicting (in answers to interrogatories and otherwise) the factual allegations on which the claims are based. It is argued that in their answers to interrogatories ("Answers") plaintiffs have admitted that there is no factual basis for the charges made in the complaint as filed and that the Answers seek to support the claims that the Court, in denying the motion to amend, previously refused to allow the plaintiffs to assert. It follows, according to the defendants, that since the plaintiffs have repudiated their original claims and "have been refused leave to assert the claim for which they now profess to have factual support," there is no dispute as to any material fact and summary judgment is appropriate.

In opposition to the motion the plaintiffs have filed a 58 page brief, together with appendices totalling 984 pages including affidavits, deposition excerpts, statistical tables, magazine and newspaper articles, copies of speeches, correspondence, intra-company memoranda, graphs, charts, and so on. However, putting aside a determination of the relevance of this material on this motion, the most significant document which plaintiffs have filed is their statement pursuant to Civil Rule 3(g) of this Court, be-

cause in that document plaintiffs list the specific items as to which they assert genuine fact issues exist.

We conclude that the plaintiffs have not established that a genuine issue of fact remains in the case because on examination it is evident that the alleged factual disputes are: (a) matters as to which admissions, or interrogatory answers contrary to the proposition alleged, have been made, so that the claim of a remaining issue is undercut (claims 1 through 6); (b) claims of damages which have no force unless an issue as to liability exists (7); (c) irrelevant contentions (8); (d) assertions of facts not challenged (9); or (e) allegations of injuries to plaintiff but accompanied by statements that plaintiff "does not assert a claim for damages as a direct result of that injury" (10, 11).

Item 1 alleges that the following proposition is in dispute:

"(1) Defendants conspired to increase the prices at which they sold domestically produced copper and did increase said prices at or about the same time."

We agree with defendants that while this proposition is consistent with the complaint, plaintiffs' answers to the interrogatories establish that this is no longer plaintiffs' claim. For instance, answer to interrogatory 98 states (p. 84 of Answers):

"Triangle was compelled to pay higher prices for copper than would otherwise have been the case except for the unlawful violations of the antitrust laws alleged. This resulted both (sic) from the fact that defendants' conspiracy to fix the U.S. producers' price at *artificially low levels* directly caused open market prices of refined copper sold in reference to the exchanges to rise to premium levels." (Emphasis added)

Aside from the fact that, if we correctly understand the theory here expressed, this claim seems perilously close to the *Reading* claim which was dismissed for the reasons described above, the theory articulated in the quoted answer appears to negate the issue-claim articulated in Item (1) above and to eliminate it as a basis for precluding summary judgment.

Item 2 specifies that

"Defendants concertedly allocated the supply of domestically produced copper on a discriminatory and punitive basis."

There are several reasons why this alleged issue-claim is insufficient. In the first place, it raises for the first time a theory of a concerted refusal to deal, not articulated in the complaint. While paragraph 26 of the complaint alleges discriminatory allocation it makes no reference to any concerted action. (In failing to do so, it is in notable contrast to the language of the companion *Reading* complaint which did make such allegations.)

Second, although the plaintiffs originally claimed that the defendants' allocations favored the defendants or their subsidiaries, they now in contradiction assert that the defendants were in fact "discriminating against their own fabricating facilities." (P. 24 of Memorandum). Moreover, although the plaintiffs rely on the affidavit of Bruce Johnson, former executive Vice President of Triangle Industries, sworn to June 4, 1982, for the proposition that during the period 1964–70 repeated attempts were made by Johnson on behalf of Triangle to secure supplies of copper from the defendants and "on every occasion" each defendant "refused" to sell copper to Triangle, such a claim is contradicted by plaintiffs' own prior interrogatory answers. For example, the answer to Interrogatory 19H shown at Tab # 1 of the material submitted by defendants shows very substantial purchases from the defendants. In the circumstances, the presentation of Johnson's affidavit and the assertions it contains appear disingenuous.

In sum, plaintiffs' admission that defendants' allocation methods discriminated against defendants' own fabricating facilities added to the admission that plaintiffs purchased substantial amounts of copper from the defendants during the period in question, (in flat contradiction of plaintiffs' claim of a refusal to deal), altogether undercuts issue-claim # 2 of the 3(g) state-

ment that "defendants concertedly allocated the supply of domestically produced copper on a discriminatory and punitive basis."

In Item 3, plaintiffs specify as an issue that "defendants conspiratorially *curtailed* production in order to control prices." This claim, although consistent with paragraph 25(c) of the complaint, is undercut by, e.g., plaintiffs' Supplementary Answer 37 (Second Set) that from 1964–1970 the defendants "jointly *increased* production in order to control price increases," and by similar statements at page 26 of plaintiffs' memorandum that industry statistics were "utilized by defendants in jointly *increasing* the supply of copper needed to balance demand and stabilize prices . . .". (Emphasis added throughout).

Item 4 asserts that "Defendants controlled the price of fabricated products by conspiratorially setting prices for defendants' own copper products." This proposition, which is more fully developed at pages 32–45 of plaintiffs' memorandum, is inconsistent with subparagraph 25(d) of the complaint—which plaintiff has sought unsuccessfully to amend. Paragraph 25(d) asserts that defendants charged "prices for defendants' own copper fabricated products *which do not properly reflect the increase in the price of copper* . . .", yet the present claim, as elaborated at page 43 of plaintiffs' memorandum, is that the "blended price," which it is now asserted that defendants used, "*was tied most directly to the then prevailing domestic producers' price of copper.*"

Paragraph 25(d) of the complaint is also contradicted by plaintiffs' answer to Interrogatory 71 which states (at page 58, Volume I of Answers, submitted by defendants on this motion) that "Anaconda, Kennecott & Phelps Dodge, in concert, fixed fabricat-

ed prices to *reflect* the U.S. producers price of refined copper." (Emphasis supplied throughout).[1]

Items 5 and 6 assert that the defendants conspiratorially failed to reflect, in the price of their fabricated products, the increase in the price of copper. While on their face these claims may appear consistent with the allegations of paragraph 25(d) of the complaint (which, again, plaintiffs moved unsuccessfully to amend) in fact they are not. This is because under the theory of the complaint, the defendants were claimed to be liable for not having reflected the increase in the copper which *they themselves* refined, while the issue-claims 5 and 6 now asserted (p. 46, plaintiffs' memorandum), although rejected on the motion to amend— posit liability for not "pricing at marginal cost."[2]

Item 7 merely states:

"Defendants' conspiratorial acts had a direct impact on Triangle causing it injury."

Assuming arguendo that this is true, the issue thus framed is of no force unless plaintiffs establish that questions of fact remain as to defendants' liability. Their failure to do so deprives the assertion of Item 7 of meaning.

Item 8 relates solely to defendant Kennecott's relationship with its previous subsidiary the Okonite Company and the terms of a decree by which Kennecott was required to divest itself of the ownership of Okonite. Aside from the fact that this proposition seems to have no relation to the defendants other than Kennecott, we fail to understand its relevance even to the claims against that company.

Item 9 states:

---

1. It should also be noted that the assertion underpinning the issue-claim articulated in Item 4, namely, that the defendants priced fabricated products uniformly on a blended price basis, is unsupported by evidence admissible under Rule 56(e), Fed.R.Civ.Pr. The sole material offered is the affidavit of Hendrik S. Houthakker which, at least as to the subject in question, does not purport to be based on the personal knowledge of the affiant.

2. In view of these inconsistencies we need not determine whether, as defendants argue, summary judgment should be awarded to them on these claims because of plaintiffs' alleged failure to define adequately the fabricated products market in question, or the share of the defendants in those markets. See Defendants' Reply Memorandum, pp. 19–21.

"The combined sales of Defendants to Triangle during the relevant period were approximately 12% of Triangle's copper requirements."

We doubt that this allegation is disputed, but even if it is, a dispute as to it, alone, is not sufficient to preclude the grant of summary judgment.

Finally, in Items 10 and 11 Triangle asserts issue-claims that it was injured (a) as a result of its purchases of refined copper and (b) as a result of price protection and discounts granted by defendants to purchasers of fabricated products "but [Triangle] does not assert a claim for damages as a direct result of that injury." Putting aside the proposition that these phrases appear, because of the explicit waivers of damages which they state, to be nonclaims, the allegations of injury do not preclude the grant of summary judgment where, as indicated in the discussion above, defendants are entitled to summary judgment as to liability.

We conclude that the defendants have established that no genuine issue remains as to any material fact and that, in the circumstances, defendants are entitled to summary judgment dismissing the complaint. The motion is granted.

It is so ordered.