**READING INDUSTRIES, INC.,**
**Plaintiff–Appellant,**

v.

**KENNECOTT COPPER CORPORATION**
**et al., Defendants–Appellees.**

**No. 731, Docket 79–7762.**

United States Court of Appeals,
Second Circuit.

Argued April 3, 1980.
Decided Sept. 24, 1980.

Jerry S. Cohen, Washington, D. C. (Harold E. Kohn, Michael D. Hausfeld, and Kohn, Milstein & Cohen, Washington, D. C., on brief), for plaintiff–appellant.

Michael A. Cooper, New York City (Bruce E. Clark, Janette Patterson, Darrell K. Fennell, and Sullivan & Cromwell, New York City, on brief), for defendants–appellees Kennecott Copper Corporation and Chase Brass & Copper Company, Inc.

Andrew C. Hartzell, Jr., New York City (Martin F. Evans, Douglas S. Eakeley, Mark A. Conley, and Debevoise, Plimpton, Lyons & Gates, New York City, on brief), for defendants–appellees Phelps Dodge Corporation and Phelps Dodge Industries, Inc.

Paul G. Pennoyer, Jr., New York City (Michael S. Davis, Kathryn A. Brown, and Chadbourne, Parke, Whiteside & Wolff, New York City, on brief), for defendants–appellees The Anaconda Company and Anaconda American Brass Company.

Before MANSFIELD and NEWMAN, Circuit Judges, and GOETTEL,* District Judge.

## NEWMAN, Circuit Judge:

This appeal concerns a somewhat bizarre attempt to obtain damages under the antitrust laws. Reading Industries, Inc. (Reading) alleges that a conspiracy to keep prices *low* caused it, through a series of complex market interactions, to pay prices that were unduly *high*. The District Court for the Southern District of New York (Morris E. Lasker, Judge) granted defendants' motion for summary judgment on the grounds that Reading lacked standing to sue. 477 F.Supp. 1150.[1] We affirm the judgment for defendants.

Reading, a refiner of copper scrap and a manufacturer of copper tubing, brought this suit for treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15 (1976), against defendants Kennecott Copper Corporation, Phelps Dodge Corporation, and the Anaconda Company, vertically integrated firms, which together produce approximately 60 percent of the refined copper used by the nation's copper fabricators. Reading charged that during the period 1964–1970 defendants conspired to fix the price of domestically refined copper and to monopolize the market for its sale, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (1976).[2]

During the 1960's, there were three significant pricing systems for copper. The first was a price quoted by defendants for domestically refined copper; this was known in the industry as the "producers' price." The second consisted of the prices quoted for refined copper on the London Metal Exchange (LME), a futures market significant to fabricators only insofar as many small domestic and the major foreign producers based their copper price on its quotations. The third consisted of the prices quoted in the copper scrap market, in which several hundred independent dealers traded. Reading purchased the copper needed for its fabricating operations in this scrap market. According to the complaint, prices in this market closely followed the LME prices.

Between 1964 and 1970, all major domestic producers quoted identical prices, each meeting any price change initiated by another. This producers' price was considerably lower than the LME price throughout the period. The refined copper sold by de-

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. Defendants also moved for summary judgment on grounds that the undisputed evidence available for trial failed to show any violation and that the decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), foreclosed the action. Judge Lasker rejected these two contentions, though relying in part on the reasoning of *Illinois Brick* in granting defendants' motion. 477 F.Supp. 1150 (S.D.N.Y.1979).

2. The initial complaint in this complex litigation was filed in 1971, and after seven years of pretrial motions and extensive discovery, an amended complaint was filed on July 9, 1979 because the plaintiff's theory of the case had changed radically over the course of the proceedings.

fendants was thus cheaper than copper available from other sources, including scrap dealers. Acknowledging that they could have charged higher prices and still maintained their level of short–run sales, defendants contended that, acting independently, they set low prices in order to protect long–run sales. This was done, they asserted, to avoid declining demand, a matter of concern because other metals can be readily substituted for copper.[3] Defendants also contended they were responding to governmental pressure for low prices.[4]

The core of Reading's theory of recovery is derived from this complex market structure. Reading contends that the defendants conspired to maintain the producers' price at artifically low levels, well below the LME price, and that this resulted in Reading's paying higher prices in the copper scrap market. The mechanism by which defendants were alleged to affect these two markets was a rationing system that allocated their low–priced copper among customers who demanded more copper at that price than defendants were willing to supply. These customers, who were copper fabricators like Reading, then turned to other markets to meet their copper requirements and were able to "bid up" the price of copper scrap from savings on their purchases of defendants'. refined copper. In this respect, Reading argues, although its amended complaint does not allege that it ever purchased or sought to purchase refined copper from defendants, it was injured by their actions because it paid more for copper scrap than it would have paid had defendants not held their prices for refined copper below the market clearing price.

Antitrust law has long recognized that defendants who may have violated a provision of the antitrust statutes are not liable to every person who can persuade a jury that he suffered a loss in some manner "that might conceivably be traced" to the conduct of the defendants. *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 263 n.14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). Various doctrines have evolved to delineate categories of circumstances under which losses are not recoverable, even though causally related to an antitrust violation. Unfortunately, the perimeters of these categories are not clearly marked, a consequence perhaps partially due to uncertainty as to whether the pertinent inquiry concerns whether a proper plaintiff is suing or whether a proper claim is being pursued. The inquiry is usually said to concern standing, which implies that the focus is upon the appropriateness of the particular plaintiff, though frequently the nature of the claim is being examined. See Berger & Bernstein, *An Analytical Framework for Antitrust Standing*, 86 Yale L.J. 809 (1977). This Circuit has stated that plaintiffs who have suffered injuries causally related to an antitrust violation lack standing if the injury is "indirect or incidental, or if their business was not in the target area of the allegedly illegal acts." *Long Island Lighting Co. v. Standard Oil Co. of California*, 521 F.2d 1269, 1274 (2d Cir. 1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976). Neither "direct injury" nor "target area" are concepts that admit of easy application. Both are ultimately tests of whether there is a legally significant causal relationship between the alleged violation and the alleged injury. See II P. Areeda & D. Turner, *Antitrust Law* § 334a (1978).

In this case, Reading asserts standing as a competitor of the defendants, directly injured by their conduct. Reading at one point sought damages as a competitor of defendants in the sale of refined copper, but at an earlier stage of this litigation, dropped the claim of its refining subsidi-

---

3. In other words, long–run demand for copper is elastic.

4. The 1960's was a period of worldwide shortages in copper supply, because of the combined effects of labor and political problems in copper producing countries and sharply surging demand for copper, primarily caused by the heavy defense requirements in Vietnam. *See generally* Y. Levy, *Copper: Red Metal in Flux* 22 (1968) (Federal Reserve Bank of San Francisco Monthly Review Supplement).

ary.[5] Reading's essential claim is that it was injured as a competitor of defendants in the sale of fabricated copper products, primarily copper tubing. In advancing this claim, Reading is not claiming injury derived from harm to some other party more proximately related to the consequences of the alleged violation. See *Schwimmer v. Sony Corp. of America* (2d Cir. July 10, 1980); *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292 (2d Cir. 1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972); *Billy Baxter, Inc. v. Coca-Cola Co.,* 431 F.2d 183 (2d Cir. 1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971). Nevertheless, we agree with Judge Lasker that the causal relationship between defendants' alleged violation and Reading's payment of high scrap prices is too remote to permit the imposition of liability.[6]

Reading's theory of antitrust injury depends upon a complicated series of market interactions between the two sources of copper: the refined copper market in which defendants acted and the copper scrap market in which Reading allegedly sustained injuries. To establish a causal chain, the actions of innumerable individual decision-makers must be reconstructed, including the decisions to purchase additional quantities of copper by fabricators who bought copper from the defendants; the impact of those purchasing decisions on the speculators in the LME market; the pricing decisions of copper end–product users, as affected by the LME price, who sold their consumed copper goods for scrap to scrap dealers; and finally the pricing decisions of the independent scrap dealers who determined the scrap market price that Reading faced.

In *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Supreme Court held that no antitrust action could be brought for higher prices paid by an indirect purchaser, who stood at the end of a vertical distribution line, extending from the sale of the raw material, where the alleged conspiratorial conduct occurred, to its use in a finished product, which the plaintiff purchased as the ultimate consumer, three levels down the distribution chain. The list of speculative economic behavioral assumptions about the marketplace that the Court found sufficiently remote to invalidate that chain, *id.* at 741–42, 97 S.Ct. at 2072, pales in comparison to those necessary to support Reading's claim.[7] Indeed, to find antitrust damages in this case would engage the court in hopeless speculation concerning the relative effect of an alleged conspiracy in the market for refined copper on the price of copper scrap, where count-

---

**5.** This claim was presumably dropped for lack of any facts to indicate that Reading, as a seller of refined copper, was prevented from making sales due to defendants' alleged maintenance of low prices. In fact, as a seller of refined copper, Reading appears to have benefited from the price rise, which it attributes to defendants' conduct.

**6.** The standard for review is that of Fed.R. Civ.P. 56(e) for summary judgments; Reading is to be given the benefit of all reasonable doubts in determining whether a genuine issue of material fact exists. *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir. 1975). While summary proceedings in antitrust litigation are disfavored, *Poller v. Columbia Broadcasting Sys., Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), they are not to be read out of the antitrust laws, *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–1593, 20 L.Ed.2d 569 (1968). In *Poller,* the crucial issue was one of motive and intent, which is a ques-

tion particularly unsuited for judgment on affidavits, but no such issue of motivation is presented in this case. Where the claim turns on documentary evidence and not intent, summary judgment is appropriate. *White Motor Co. v. United States,* 372 U.S. 253, 259, 83 S.Ct. 696, 699, 9 L.Ed.2d 738 (1963); *see also First Nat'l Bank of Arizona v. Cities Serv. Co., supra,* 391 U.S. at 289, 88 S.Ct. at 1592 (where crucial issue of fact is also issue of law, party cannot rest on allegations in complaint to oppose properly supported motion for summary judgment against him).

**7.** Reading's economic reasoning is as attenuated as its theory of causality. For example, to argue that scrap prices rose because competing fabricators would pay more due to savings at the lower producers' price ignores the fundamental economic fact that optimal profit–maximizing decisions depend upon marginal cost per unit and not average cost. *See* W. Baumol, *Economic Theory and Operations Analysis* 34–37 (4th ed. 1977).

**14**

less other market variables could have intervened to affect those pricing decisions. The court's task of tracing would be difficult, if not impossible, raising in aggravated form the problem that *Illinois Brick* was intended to avoid. While it is true that *Illinois Brick* holds narrowly only that indirect purchasers may not recover damages for the passing–on of overcharges due to antitrust violations, it has a broader significance in indicating that there are inherent limitations in the substantive protection afforded by the antitrust laws: they exclude claims based on conjectural theories of injury and attenuated economic causality that would mire the courts in intricate efforts to recreate the possible permutations in the causes and effects of a price change. *Cf. Mid–West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 583–85 (3d Cir. 1979).

It could be said that Reading, as a purchaser in the scrap copper market, is not in the target area of the defendants' alleged violation in maintaining artificially low prices in the sale of refined copper. Normally, those in the target area of a conspiracy to maintain low prices would be sellers unable to compete at the artificially low prices. In this case, where the alleged conspirators not only maintained low prices but also restricted output, those in the target area could also be purchasers denied an opportunity to buy from the defendants. Reading is not claiming damages in either capacity. Moreover, in the capacity in which it does sue, it predicates its claim of injury on a basis too tenuous and conjectural for a valid causal finding of anticompetitive effect and damages.

Affirmed.