Jorge M.C.C. de ATUCHA, Plaintiff,

v.

COMMODITY EXCHANGE, INC., Comex Clearing Association, Inc., the Board of Trade of the City of Chicago, the Board of Trade of the City of Chicago Clearing Corporation, Nelson Bunker Hunt, William Herbert Hunt, Lamar Hunt, International Metals Investment Co., Ltd., Bache Halsey Stuart Shields, Inc., Bache Group, Inc., Alvin Brodsky, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Conticommodity Services, Inc., Norton Waltuch, Melvin Schnell, Gillian Financial, Conticapital Management, Inc., Conticapital Ltd., Naji Robert Nahas, Sheik Mohammed Aboud Al-Amoudi, Sheik Ali Bin Mussalem, and Banque Populaire Suisse, Defendants.

No. 82 Civ. 6546 (MEL).

United States District Court,
S.D. New York.

May 9, 1985.

Leonard Toboroff, P.C., New York City, for plaintiff; Leonard Toboroff, M. Fishman, New York City, of counsel.

Baer Marks & Upham, New York City, for defendants Comex and Comex Clearing; Barry J. Mandel, Thomas E. Albright, William A. Brandt, Jr., Joshua B. Parker, New York City, of counsel.

Townley & Updike, New York City, for defendants CBOT and CBOT Clearing; James K. Leader, James E. Tyrrell, Jr., Holly Stein, New York City, of counsel.

Kirkland & Ellis, Chicago, Ill., for defendant CBOT; John E. Angle, T. Webster Brenner, Chicago, Ill., of counsel.

Murphy & Boyle Chartered, Chicago, Ill., for defendant CBOT Clearing; Robert D. Boyle, Jay L. Statland, Chicago, Ill., of counsel.

Sullivan & Cromwell, New York City for defendant Bache Halsey Stuart Shields Inc. and Bache Group Inc.; Marvin Schwartz, Richard H. Klapper, New York City, of counsel.

Seyfarth, Shaw, Fairweather & Geraldson, New York City, Shank, Irwin, Conant, Williamson & Grevelle, for defendants Lamar Hunt, Nelson Bunker Hunt and W. Herbert Hunt; Daniel S. Greenfeld, Michael Hirschfeld, New York City, Roger

Goldburg, Robert Wolin, Roderic G. Steakley, Dallas, Tex., of counsel.

Rogers & Wells, New York City, for defendants Merrill Lynch, Pierce, Fenner & Smith, Inc. and ACLI Intern. Services, Inc.; William L. Glendon, Guy C. Quinlan, Susan Garcia, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Conti-Commodity Services, Inc., ContiCapital Management Inc., ContiCapital Ltd., and Norton Waltuch; Mark H. Alcott, Richard A. Rosen, Peter W. Schneider, New York City, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant Melvin Schnell; Michael Diamond, Erskine D. Henderson, New York City, of counsel.

LASKER, District Judge.

Jorge M.C.C. de Atucha ("de Atucha") brings this suit, yet another case concerning the much publicized events in the silver market in 1979 and 1980, against The Commodity Exchange, Inc. ("Comex"), Comex Clearing Association, Inc., the Board of Trade of the City of Chicago ("CBOT"), the Board of Trade of the City of Chicago Clearing Corporation (the "exchange defendants"), as well as numerous other individuals and companies [1] (the "non-exchange defendants"). The motions are granted for lack of standing and the complaint is dismissed.

### I.

On January 18, 1980, at a time when the price of silver was approximately fifty dollars per ounce, de Atucha, "a citizen and resident of Argentina", Complaint ¶ 5 (filed Oct. 1, 1982), purchased three silver contracts on the London Metals Exchange ("LME") [2] at a total cost of approximately

---

**1.** The other defendants are Nelson Bunker Hunt, William Herbert Hunt, Lamar Hunt, International Metals Investment Co., Ltd.,* Bache Halsey Stuart Shields, Inc., Bache Group, Inc., Alvin Brodsky,* Merrill Lynch Pierce Fenner & Smith, Inc., Conticommodity Services, Inc., Norton Waltuch, Melvin Schnell, Gillian Finan-

cial,* Conticapital Management, Inc., Conticapital Ltd., Naji Robert Nahas, Sheik Mohammed Aboud Al-Amoudi, Sheik Ali Bin Mussalem and Banque Populaire Suisse. The parties highlighted by an asterisk have not joined in the motion.

**2.** The complaint alleges that de Atucha purchased three silver contracts at $50 per ounce

$1,500,000. *Id.* at ¶ 29. On April 16, 1980 de Atucha liquidated[3] his "long" position[4] at a loss in excess of $1,000,000. *Id.* at ¶ 40. De Atucha alleges that the price at which he purchased the silver contracts was artificially high because of an alleged conspiracy among the non-exchange defendants. *Id.* at ¶ 30. As for the exchange defendants, de Atucha alleges that although they took action in January 1980 to counteract the purported conspiracy and to stabilize the then volatile silver market, the corrective measures were taken too late. *Id.* at ¶ 38.[5]

The complaint presents five claims. Against the non-exchange defendants de Atucha asserts that the defendants (1) conspired to and manipulated silver and silver futures[6] contract prices in violation of the Commodities Exchange Act ("CEA") § 9(b);[7] (2) cheated and defrauded de Atucha and the silver markets and wilfully made false reports and statements to de Atucha in violation of CEA §§ 4b[8] and 4c;[9] (3) conspired to "unreasonably restrain interstate trade and commerce in silver and silver futures contracts in the United States and between the United States and ... England, with the intent and effect of raising and fixing the prices or [sic] silver and silver futures contracts," Complaint ¶ 47, in violation of the Sherman Anti-Trust Act, § 1, 15 U.S.C. § 1 (1982); and (4) monopolized the silver and silver futures contracts trade and commerce in the United States and England in violation of the Sherman Anti-Trust Act, § 2, 15 U.S.C. § 2 (1982). *Id.* at ¶ 51. Finally, de Atucha alleges that the "acts, practices and omissions" of the exchange defendants were wilfully in bad faith or negligent, and in either case, violated CEA §§ 5a(8)[10] and 5(d).[11] *Id.* at ¶ 55.

In support of de Atucha's claims the complaint also states, among other things:

> The London Exchange, located in London, England, is also a market for silver futures contract trading. Because of the fungibility of silver and silver futures, the United States market represented by the Comex and CBOT and the London Exchange function from an economic standpoint as a single market....

*Id.* at ¶ 28.

Two motions are pending. The non-exchange defendants move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dis-

---

for a total cost of $1.5 million. This implies that his three contracts called for delivery of 30,000 ounces of silver. As traded on Comex or CBOT a silver futures contract calls for delivery of 5,000 ounces of silver per contract while an LME silver contract calls for delivery of 10,000 ounces. Therefore, although not directly stated in the complaint, it follows that plaintiff traded on the LME. This fact is not in dispute.

3. Liquidation is the sale of a contract by a person holding a long position or the purchase of a contract by a person holding a short position. See complaint at ¶ 24(f). For a helpful explanation of the nature of the commodity futures markets in general see *Leist v. Simplot,* 638 F.2d 283, 286–88 (2d Cir.1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982).

4. A purchaser of a futures contracts holds a long position and a seller holds a short position. See complaint at ¶ 24(e).

5. It is questionable whether these facts, without more, are sufficient to state a claim against the exchange defendants. *See Sam Wong & Son, Inc. v. New York Mercantile Exchange,* 735 F.2d 653, 671 (2d Cir.1984); *Bishop v. Commodity Exchange, Inc.,* 564 F.Supp. 1557, 1562 (S.D.N.Y. 1983). However, we do not address this issue since the complaint is dismissed for lack of standing.

6. Although the complaint refers to LME contracts as "futures contracts" they are actually "forward contracts", which differ from futures contracts in several respects. *See* note 2, *supra.*

7. 7 U.S.C. § 13(b) 1982. Recent enactments to 7 U.S.C. § 13(b) in the Futures Trading Act of 1982, Pub.L. No. 97–444, § 227(2), 96 Stat. 2316 (1983) do not have a direct bearing on de Atucha's claim because they have no retroactive effect. *See* note 30, *infra.* This is also true as to 7 U.S.C. §§ 6c, 7a(8). (Pub.L. No. 97–444, §§ 206, 216(1).

8. 7 U.S.C. § 6b.

9. 7 U.S.C. § 6c.

10. 7 U.S.C. § 7a(8).

11. 7 U.S.C. § 7(d).

miss (1) the antitrust claims against them on the ground that plaintiff lacks "antitrust standing" and (2) the claims against them arising under the CEA on the ground that de Atucha has not established standing under that Act. The exchange defendants also move to dismiss the complaint against them pursuant to Rule 12(b)(6), Fed.R.Civ.P., on the ground that plaintiff lacks standing to sue. For the reasons set forth below the complaint is dismissed.

## II.

### Antitrust Claims

De Atucha seeks treble damages pursuant to the Clayton Act, § 4, 15 U.S.C. § 15 (1982), based upon the non-exchange defendants' alleged attempt to monopolize and restrain the silver and silver futures trade and commerce. The non-exchange defendants argue that de Atucha lacks standing to sue under Section 4 because de Atucha's injury occurred outside of United States commerce and his injury, if any, was too remote from the alleged violation to sustain a claim under United States antitrust law. The defendants [12] further argue that de Atucha cannot sue under Section 4 because plaintiff's alleged injury resulted from a restraint on foreign, rather than American commerce. Although the complaint alleges that the defendants attempted to monopolize (and restrain the trade of) the world silver market, *see, e.g.,* Complaint ¶ 30(b), de Atucha's theory of standing, as we understand it, is that he may sue under American antitrust laws because the defendants' manipulation of the American silver markets produced his injury on the LME. *See* Transcript (Jun. 3, 1983) (oral argument) at p. 15. De Atucha further argues that as a trader in silver commodities he has standing to maintain an action under the antitrust laws against those who

attempted to monopolize the world silver market since, he asserts, he is "clearly in the target area" of the antitrust violation and because he sustained direct injury.

De Atucha's reliance on the target area test, the approach to Section 4 standing previously followed in this Circuit, is misplaced. As the Court of Appeals recently explained:

> This is not the proper method of analysis. With two recent elaborate Supreme Court opinions with respect to the scope of § 4 of the Clayton Act on the books, courts in this circuit should start their analysis of standing under § 4 with the Supreme Court opinions [in *Associated General Contractors of California, Inc. v. California State Council,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) and *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) ] rather than engage in extensive parsing of *Billy Baxter,* [*Inc. v. Coca-Cola Co.,* 431 F.2d 183 (2d Cir.1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971) ] and *Calderone* [*Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292 (2d Cir.1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972) ]. The "target area" test embodied in those decisions was adopted over powerful dissents, has proved difficult to apply, and is received tepidly in the leading treatise, 2 Areeda & Turner, Antitrust Law § 334d, at 165–68 (1978). (Additional citation omitted).

*Crimpers Promotions, Inc. v. Home Box Office, Inc.,* 724 F.2d 290, 293 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984). Accordingly, despite plaintiff's reliance on a target area analysis [13] "[we] ... are compelled to fol-

---

**12.** For the purposes of the section of the opinion discussing the antitrust claims "defendants" refers to the moving non-exchange defendants.

**13.** De Atucha also relies heavily upon *Strax v. Commodity Exchange, Inc.,* 524 F.Supp. 936 (S.D.N.Y.1981) and *Pollock v. Citrus Associates,* 512 F.Supp. 711 (S.D.N.Y.1981) for the proposition that traders in the silver futures market

who were damaged by the price manipulations brought about by defendants' anticompetitive conduct are entitled to recover damages under the antitrust laws. De Atucha's reliance on these cases is misplaced. The decisions are inapplicable to the instant action because in *Strax* and *Pollock* the plaintiffs traded on and were allegedly injured on United States Exchanges.

low the approaches adumbrated by the Supreme Court in *McCready* and *Associated General [Contractors]* ..." in determining whether de Atucha has standing to bring his antitrust claims. *Id.*

■ Section 4 of the Clayton Act provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore ... and shall recover threefold the damages by him sustained...." 15 U.S.C. § 15. The broad language of the Act notwithstanding, in both *McCready* and *Associated General Contractors* the Supreme Court has reaffirmed that it was not Congress' intent "to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages...." *Blue Shield of Virginia v. McCready,* 457 U.S. at 477, 102 S.Ct. at 2547; *accord Associated General Contractors of California v. California State Council,* 459 U.S. at 535, 103 S.Ct. at 907. In *McCready,* Justice Brennan (for the majority) surveyed past Supreme Court opinions discussing restrictions on a plaintiff's standing to sue for treble damages and concluded that there are two considerations which may limit the availability of a Section 4 remedy: the prevention of duplicative recoveries and the limitation on injuries which are too remote from the alleged violation. *See* 457 U.S. at 476, 102 S.Ct. at 2546. Subsequently, Justice Stevens, (also writing for the majority of the Court) in *Associated General Contractors,* enumerated five factors against which courts should analyze the standing issue. *See* 459 U.S. at 536 n. 33, 103 S.Ct. at 908 n. 33. Not surprisingly, there is considerable overlap between the issues discussed in the two opinions. Indeed, despite minor differences in analytic approach, careful scrutiny reveals that with one exception, discussed below, the *Associated General Contractors* "factors"

and the *McCready* "limitations" involve the same considerations. In any event, the Court's refusal to adopt a bright line rule requires that the standing determination be made on a case by case analysis. Upon evaluating the circumstances here presented in light of the relevant factors we conclude de Atucha does not have standing under American antitrust law to maintain this action.

■ As was true in *Associated General Contractors,* not all of the factors in this case are unfavorable to the plaintiff. The plaintiff correctly asserts that the limitation embodying the policy against duplicative recoveries, which focuses primarily "on the risk ... engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws", *Blue Shield of Virginia v. McCready,* 457 U.S. at 475, 102 S.Ct. at 2546, is not an issue here.[14] This is not a situation in which there are "innocent middleman"; the other parties to de Atucha's transactions, for instance Merrill Lynch, the brokerage house that placed de Atucha's silver trades, are named in the complaint as defendants. De Atucha's personal loss of anticipated profits on the LME is a discrete injury which does not involve different levels of harmed individuals. *Cf. Crimpers Promotions Inc. v. Home Box Office, Inc.,* 724 F.2d at 293–94 (limitation designed to prevent double recovery inapplicable where plaintiff's injury was "distinct and different").

The "conceptually more difficult question", *Blue Shield of Virginia v. McCready,* 457 U.S. at 476, 102 S.Ct. at 2546, and the critical inquiry here, is whether de Atucha's injury on the LME is too remote from the antitrust violation to serve as the gravamen of a Section 4 claim.[15] Initially, in evaluating whether

---

**14.** Unlike *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) and *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), the leading Supreme Court cases on the so called "pass-on" proposition, this is clearly not such a case.

**15.** Justice Brennan analogized the remoteness inquiry to the analysis utilized by the courts to determine proximate cause. He remarked that the inquiry as to what constitutes an injury for antitrust purposes is "no less elusive" than the evaluation of proximate cause. *Blue Shield of*

plaintiff's injury is too fortuitous, one must "look ... to the physical and economic nexis between the alleged violation and the harm to the plaintiff", *id.* at 478, 102 S.Ct. at 2548, or, as Justice Stevens characterized it "the directness or indirectness of the asserted injury." *Associated General Contractors of California v. California State Council,* 459 U.S. at 540, 103 S.Ct. at 910.

In *Associated General Contractors,* the plaintiffs, two construction unions representing individuals who worked for the defendants, alleged, among other things, that the defendants exerted pressure on builders to hire contractors and subcontractors who did not have collective bargaining agreements with the plaintiff unions. Conceding that "[t]he complaint does allege a causal connection between an antitrust violation and harm to the Union and further alleges that the defendants intended to cause that harm",[16] *id.* at 537, 103 S.Ct. at 908, the Court nonetheless dismissed the antitrust claim. The Court's conclusion that the Unions' injuries were "clearly indirect", was one of the factors dictating dismissal.

The Court of Appeals' opinion in *Reading Industries, Inc. v. Kennecott Copper Corporation,* 631 F.2d 10 (2d Cir.1980), *cert. denied,* 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981) is closer to the case at hand. The antitrust claim put forward in *Reading* involved three significant pricing systems for copper: (1) the "producers' price",[17] (2) quoted prices on the LME and (3) the copper scrap market price. *Id.* at 11. The issue raised by the plaintiff's claim was whether there was a legally significant causal relationship between the defendant's alleged antitrust violation, (a conspiracy to fix the price of domestically refined copper and to monopolize the market for its sale), *id.,* and the plaintiff's alleged injury (payment of prices on the copper scrap market that were unduly high). The Circuit Court concluded the relationship was too attenuated to permit recovery of treble damages under the Clayton Act. *Id.* at 13.

De Atucha's claim is strikingly similar to the facts in *Reading.* Moreover, the reasoning of the *Reading* court applies here.[18] Indeed, by merely changing the relevant nouns the words of the Second Circuit might have been addressing the merits of de Atucha's claim:

> [De Atucha]'s theory of antitrust injury depends upon a complicated series of market interactions between the two [silver markets]: the [United States market] in which defendants acted and the [London Metals Exchange] on which [de Atu-

---

*Virginia v. McCready,* 457 U.S. at 477, 102 S.Ct. at 2547; *accord Associated General Contractors of California v. California State Council,* 459 U.S. at 535-37, 103 S.Ct. at 907-08.

**16.** While the specific intent of the defendants is a factor to consider, the mere fact that the complaint alleges improper motive is not "a panacea that will enable any complaint to withstand a motion to dismiss." *Associated General Contractors of California, Inc. v. California State Council,* 459 U.S. at 537, 103 S.Ct. at 908. Here, the statement in the complaint that the defendants deliberately manipulated all significant silver markets does not answer the question whether de Atucha has standing under the Clayton Act as a trader on the LME. *See Id.*

**17.** The price quoted for domestically refined copper by Kennecott Copper Corporation, Phelps Dodge Corporation and Anaconda Company, the defendants in *Reading* and the producers of "approximately 60 percent of the refined copper used by the nation's copper fabricators."

*Reading Industries, Inc. v. Kennecott Copper Corporation,* 631 F.2d at 11.

**18.** We recognize, of course, that *Reading* was decided before the Supreme Court's rulings in *McCready* and *Associated General Contractors.* Courts in this Circuit have been advised to follow the approaches taken by the Supreme Court "without concern whether the results are consistent with language in earlier Second Circuit cases". *Crimpers Promotions, Inc. v. Home Box Office, Inc.,* 724 F.2d at 293. However, the Court of Appeals also indicated that their prior decisions have not necessarily "been drained of their precedential vitality on their own or very similar facts...." *Id.* The *Reading* court's analysis of causation is based upon the same principles as the remoteness inquiry set forth in *McCready* and *Associated General Contractors.* This, in addition to the factual similarities between this case and *Reading,* lead us to conclude that *Reading* offers valid precedential guidance on the issue of standing.

cha] allegedly sustained injuries. To establish a causal chain, the actions of innumerable individual decision-makers must be reconstructed....

Indeed, to find antitrust damages in this case would engage the court in hopeless speculation concerning the relative effect of an alleged conspiracy in the [United States silver futures] market on the price of [LME silver forwards], where countless other market variables could have intervened to affect those pricing decisions.

*Id.* at 13–14.

Plaintiff himself acknowledges the indirect nature of his claim. He argues "[h]ere, the unlawful transactions on the 'contract markets' caused the collapse of the U.S. silver markets which in turn caused Atucha's injury on the LME." Plaintiff's Sur-Reply Memorandum in Response to the Reply Memoranda of Defendants and in Support of the Complaint (filed Apr. 21, 1983) at p. 17. However, even recognition of the indirectness of causation involved does not reflect the numerous complex transactions which must be considered in determining the cause of the "collapse" of each market individually, and it certainly does not account for the additional factors that must be evaluated to make a determination as to how the markets interact, if they do. We conclude that the indirect relationship between de Atucha's claim and the alleged violation is a factor which strongly supports the inapplicability of the antitrust laws to de Atucha's claim.

Another factor considered in *Associated General Contractors,* one related to the indirectness of the injury, is the speculative nature of the damages. *Associated General Contractors of California v. California State Council,* 459 U.S. at 542, 103 S.Ct. at 911; *see also Blue Shield of Virginia v. McCready,* 457 U.S. at 475 n. 11, 102 S.Ct. at 2546 n. 11; *Reading Industries, Inc. v. Kennecott Copper Corporation,* 631 F.2d at 13–14. De Atucha argues that his loss is inextricably connected with the economic impact felt in the United States. The non-exchange defendants agree that as a matter of economic theory prices on the LME should not deviate substantially from prices on domestic exchanges. However, the defendants correctly assert that even in cases involving the equilibration of prices on related *domestic* markets the courts have rejected the damage claim as too speculative and indirect. *See Reading Industries Inc. v. Kennecott Copper Corporation,* 631 F.2d at 13–14; *LeFrak v. Arabian American Oil Co.,* 487 F.Supp. 808, 824–25 (S.D.N.Y.1980). For substantially the same reasons put forth in *Reading,* 631 F.2d at 13–14, we find that the highly speculative nature of de Atucha's damage claim is another consideration dictating dismissal. Moreover, for reasons explained below, plaintiff's position in the silver market relative to the defendants' position in the market would further complicate the proof of damages. Plaintiff and the defendants both purchased long contracts during the period between January 18, 1980 and April 16, 1980 and de Atucha's losses occurred in the period of plummeting silver prices that also, apparently, caught the defendants by surprise. Accordingly, this is not a case where the defendants and plaintiffs held offsetting positions.[19] If it were, calculating the damages would involve an analytically uncomplicated "zero sum" formula (each dollar gained by a long trader is lost by a short trader on the other side of the contract). *See Pollock v. Citrus Associates,* 512 F.Supp. 711, 719 (S.D.N.Y.1981) citing *Leist v. Simplot,* 638 F.2d at 286–87; *accord Strax v. Commodity*

---

**19.** Defendants further argue that de Atucha is not in the target area of the violation because he and the defendants both held long positions in the market. De Atucha correctly points out decisions in which "long" plaintiffs were allowed to sue "long" defendants. *E.g., Leist v. Simplot,* 638 F.2d 283, 290–91 (2d Cir.1980), *aff'd,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). In considering de Atucha's market position vis-a-vis the defendants we do not hold that plaintiffs can never sue individuals on the same side of commodities contracts. As previously stated, the standing determination is to be made on a case by case basis. This is merely one factor we deem appropriate to consider here.

*Exchange, Inc.,* 524 F.Supp. at 939–40 (S.D. N.Y.1981). Here, however, the damage claim would require determining the cause of the price decline on the United States market, and then, the impact of the United States market decline, if any, on the price decline on the LME, a foreign exchange subject to different regulations, rules and committees than the United States exchanges.

Another factor to be considered in the remoteness inquiry is whether plaintiff's alleged injury "reflects Congress' core concerns in prohibiting the antitrust defendants' course of conduct." *Blue Shield of Virginia v. McCready,* 457 U.S. at 481, 102 S.Ct. at 2549; *accord, Associated General Contractors of California v. California State Council,* 459 U.S. at 538, 103 S.Ct. at 909. The non-exchange defendants argue strenuously that in enacting the antitrust laws it was not Congress' intent to protect a foreign consumer injured in foreign commerce. De Atucha's not capricious response is that failure to allow him (and others similarly situated) to bring his antitrust claim will, in effect, grant a license to rig foreign markets, which would impact on American consumers (by creating the converse of the situation in this case). According to de Atucha, it was Congress' intent that our "important public markets (citing *Leist v. Simplot,* 638 F.2d at 298 n. 14) be kept free from pollution."

There is no doubt that the primary purpose of the antitrust laws is to protect American consumers, *see Pfizer, Inc. v. Government of India,* 434 U.S. 308, 314, 98 S.Ct. 584, 588, 54 L.Ed.2d 563 (1978), and American (foreign and domestic) commerce.[20] *Cf.* 21 Cong.Rec. 2456 (1890) (Remarks by Senator Sherman: "The purpose of this bill is to enable the courts of the United States to apply the same remedies against combinations which injuriously af-

fect the interests of the United States that have been applied in the several states to protect local interests.") Sections one and two of the Act, under which de Atucha brings his antitrust claims, prohibit the monopoly or restraint of "... trade or commerce among the several states, or with foreign nations...."

The *Associated General Contractors* Court, in addressing the issue of congressional intent, has recently stated that "[a]s the legislative history shows the Sherman Act was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market." 459 U.S. at 538, 103 S.Ct. at 908. In denying standing to the plaintiff Union the Court further explained, "in this case, however, the Union was neither a consumer nor a competitor in the market in which trade was restrained." *Id.* at 539, 103 S.Ct. at 909.

In contrast to that decision, the plaintiff in *McCready* was permitted to sue under Section 4 where the complaint alleged restraint in the market for psychotherapy services, and the plaintiff was a consumer in that market. The Court concluded that "... McCready's injury was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws", 457 U.S. at 483, 102 S.Ct. at 2550, and that such an injury "falls squarely within the area of congressional concern." *Id.* at 484, 102 S.Ct. at 2551.

Here, de Atucha is not an American consumer nor did he trade in American commerce. His injury occurred on, and was directly caused by price fluctuations on the LME. The complaint alleges that "the United States market represented by the Comex and CBOT and the London Exchange function from an economic standpoint as a single market...." Complaint

---

**20.** Recently, Congress modified the Sherman Act to specifically limit jurisdiction over foreign conduct to cases in which the conduct has a "direct, substantial and reasonably foreseeable effect" on American commerce. Although the amendment is not applicable to the instant action (because it relates to jurisdiction, not stand-

ing, and also because we are not faced here with "foreign conduct"), the enactment does evidence a reaffirmation of the proposition that the Sherman Act is directed to the protection of *American* trade. Pub.L. No. 97–290, Title IV, § 402, 96 Stat. 1246 (1982).

at ¶ 28 and for the purposes of the motion the allegations must be accepted as true. However, notwithstanding the economic interaction between the United States and London markets, in light of the purpose of the Sherman Act it is logical to conclude that the first prerequisite to a determination that a plaintiff was injured in "the relevant market" is a finding that the market is part of American foreign or domestic commerce since "[t]he antitrust laws do not extend to protect foreign markets from anticompetitive effects." *Platt Saco Lowell Ltd. v. Spindelfabrik Suessen-Schurr,* 1978–1 Trade Cases. (CCH) ¶ 61,-898, at 73,775 (N.D.Ill.1977). We conclude that Congress did not contemplate recovery under the antitrust laws by an individual who traded, and was injured entirely outside of United States commerce.

Finally, de Atucha argues that it is necessary to allow plaintiffs such as himself to sue to deter future potential market manipulators. The short answer to this contention is that scores of others have already sued these defendants in regard to the same acts.

■ Deterrence is one of the congressional aims of Section 4 of the Clayton Act. *E.g., Pfizer Inc. v. Government of India,* 434 U.S. at 314, 98 S.Ct. at 588. The Act, in effect, confers upon individuals the role of private attorney generals by providing treble damages as an incentive to potential plaintiffs and a disincentive to would-be violators. In *Pfizer, supra,* a case upon which plaintiff relies, added deterrence was a factor in the Court's holding that foreign governments could sue under Section 4. *Id.* at 315, 98 S.Ct. at 589. However, in the Court's latest and most expansive decision on Section 4 standing the Court stated that:

> "[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the pub-

lic interest in antitrust enforcement diminishes the justification for allowing a more remote party ... to perform the office of a private attorney general. Denying the [plaintiff] a remedy on the basis of its allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied."

*Associated General Contractors of California v. California State Council,* 459 U.S. at 542, 103 S.Ct. at 911.

Here, individuals who traded on United States exchanges and who may have suffered injury resulting from the defendants (alleged) manipulation of the silver market are an identifiable class of persons whose claims would not be plagued with the "conceptual difficulties" presented by de Atucha's claim and have indeed brought numerous suits against all the defendants here to "vindicate the public interest." [21]

To summarize, we conclude that the relationship between de Atucha's alleged injury on the LME and the defendants' alleged violation on the United States silver exchanges is too attenuated to allow the antitrust claim, and further, that recovery for such an injury would not accurately reflect congressional intent. Finally, the existence of a readily identifiable class of plaintiffs to enforce the antitrust laws against these defendants, if it should prove appropriate to do so, diminishes the justification for permitting the cause of action. Accordingly, the antitrust claims are dismissed for lack of standing.

### The Commodity Exchange Act

Both the non-exchange defendants and the exchange defendants move to dismiss the claims based on the CEA. The non-exchange defendants argue that, by their own terms, CEA Sections 4b [22] and 9(b) [23] do not proscribe fraud or manipulation on foreign commodities markets. The ex-

---

21. *See, e.g., Strax v. Commodity Exchange Commission,* 79 Civ. 5366 (MEL) (S.D.N.Y. filed Oct. 12, 1979); *Freemarket v. Commodity Exchange Commission,* 82 Civ. 366 (MEL) (S.D.N.Y. filed Jan. 20, 1982); *Gordon v. Hunt,* 82 Civ. 1318 (MEL) (S.D.N.Y. filed March 4, 1982); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith,* 83

Civ. 8898 (MEL) (S.D.N.Y. filed Dec. 8, 1983); *Korwek v. Hunt,* 84 Civ. 7934 (MEL) (S.D.N.Y. filed Nov. 20, 1984).

22. 7 U.S.C. § 6b.

23. 7 U.S.C. § 13(b).

change defendants move to dismiss the complaint on the ground that de Atucha cannot maintain an action against them under the CEA because he did not trade on either of the defendant contract markets nor were his trades cleared through either of the defendant Clearinghouses. They argue that plaintiff does not have standing to sue under the CEA and alternatively, that de Atucha's injuries were not proximately caused by any actions of Comex and/or CBOT.[24]

De Atucha answers that the defendants' manipulation of United States markets (and the failure to regulate them) makes them liable under the CEA; that his injuries on the LME were caused by the defendants' actions (and/or inaction); and that pursuant to the Second Restatement of Foreign Relations Law he has the right to sue for manipulation and failure to regulate.

In *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182, the United States Supreme Court considered for the first time whether there was an implied private right of action under the CEA. It concluded that there was, and further, that the cause of action extended to hold accountable the exchanges who violated their own rules, as well as individuals who conspire to defraud consumers or to manipulate the markets. In finding the existence of a private right, the Court observed that "unless and until Congress acts, the federal courts must fill in the interstices of the implied cause of action under the CEA." *Id.* at 395, 102 S.Ct. at 1848.

■ The issue in the instant action falls squarely within the void left unfilled by *Curran*. *Curran* determined that a private cause of action exists, and that purchasers and sellers of commodities who suffer injury resulting from their trading have standing to sue. However, since the *Curran* plaintiffs/respondents traded commodities on United States exchanges the Court did not consider whether a foreign resident who trades (and is allegedly injured) on a foreign market has standing under the CEA. The question appears to be one of first impression in this Circuit.

Whether de Atucha has standing under the Act is a matter of congressional intent requiring examination of the provisions pursuant to which he brings his claims. CEA Section 4b[25] prohibits fraud "in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce made, or to be made, *on or subject to the rules of any contract market, ...*" (emphasis added). Under CEA Section 9(b)[26] it is a felony "to manipulate or attempt to manipulate the price of any commodity ... for future delivery *on or subject to the rules of any contract market,* or to corner or attempt to corner any such commodity ...*"* (Emphasis added). CEA Section 5a(8),[27] under which de Atucha is suing the exchange defendants, contains the language emphasized above.

■ We start with the proposition that the laws of any jurisdiction apply only to activities within its borders unless there is some indication to the contrary. As we interpret the plain language of the statutes, the CEA sections upon which de Atucha bases his claims do not proscribe fraudulent conduct in connection with transactions occurring on foreign markets. A leading treatise on Commodities Regulation, written by the chairperson of the Commodities Futures Trading Commission ("CFTC" or "Commission"), and the one court that appears to have considered the question have concluded that the language of the statutory provisions limits their

---

**24.** What constitutes legal causation under the CEA was left unanswered in *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 395, 102 S.Ct. 1825, 1848, 72 L.Ed.2d 182 (1982). It is unnecessary for us to decide whether de Atucha's alleged injuries were "proximately caused" by actions prohibited under the CEA since we have concluded that he lacks standing to sue.

**25.** 7 U.S.C. § 6b.

**26.** 7 U.S.C. § 13(b).

**27.** 7 U.S.C. § 7a(8).

scope to the regulation of *domestic* transactions. *See* II P. JOHNSON, COMMODITIES REGULATION § 5.42 at 329 (1982) ("Sections 4b and 4o would appear adequately to cover fraud in connection with *domestic* futures contracts, that is, futures 'on or subject to the rules of a contract market.'") (Emphasis in the original); *Palmer Trading Co. v. Shearson Hayden Stone, Inc.*, [1977–1980] Comm.Fut.L.Rep. CCH ¶ 20,900 at 23,564 (N.D.Ill.1979) ("The statutory language is clearly limited to contracts of sale that are 'made, or to be made, on or subject to the rules of any contract market'.").

The history of commodities regulation supports this reading of the statutes. The fundamental purpose of the CEA is "insuring fair practice and honest dealing on the commodity exchanges and providing a measure of control over those forms of speculative activity which often demoralize the markets to the injury of producers, consumers, and the exchanges themselves." [28] S.Rep. No. 1131, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.CODE CONG. & AD.NEWS 5843, 5844; *accord Deaktor v. L.D. Schreiber & Co.*, 479 F.2d 529, 534 (7th Cir.), *rev'd on other grounds*, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973). While the quoted words do not refer specifically to United States markets and consumers, the discussions in the record on the history of the commodities market, the manner of its operation and the necessity and role of governmental regulation refer only to the United States commodities market and American investors. *See e.g.,* S.Rep. No. 1131, 93rd Cong., 2nd Sess., *reprinted in* 1974 U.S.CODE CONG. & AD.NEWS 5843, 5852–60. It is reasonable

to conclude that American markets and consumers were the targets of congressional concern and that the regulation of fraud in connection with trading on domestic markets, or transactions entered into by American investors was the congressional purpose.

Although the legislative history prior to and surrounding the comprehensive enactments of 1974 offers only nominal insight into Congress' intent, we have found nothing in the legislative history which suggests that the legislature intended the CEA to confer a cause of action upon foreign litigants who traded exclusively on foreign markets.[29] Indeed, it appears that the subject of foreign futures trading was first raised in connection to the 1982 amendments to the Act. The recent enactments include a section which specifically states that the amendments have no retroactive effect.[30] Accordingly, the legislation is not directly relevant to de Atucha's claim because it arises out of transactions occurring in 1980. However, the Court of Appeals of this Circuit has held that it is proper to consider the 1982 statute in examining Congress' intent as to the earlier provisions of the Act, despite the non-retroactivity provision. *See Sam Wong & Son, Inc. v. New York Mercantile Exchange*, 735 F.2d 653, 676 n. 30 (2d Cir. 1984); *accord Jordon v. New York Mercantile Exchange*, 571 F.Supp. 1530, 1540–41 (S.D.N.Y.1983), *aff'd in relevant part*, 735 F.2d at 653.

The 1982 legislation included a new CEA Section 22, (reprinted in full in the margin),[31] which provides for a private right of

**28.** For a review of the history of the CEA *see Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. at 360–67, 102 S.Ct. at 1830–34.

**29.** De Atucha argues, by analogy, that under *Pfizer, Inc. v. Government of India,* 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 a decision which held that foreign nations may sue under Section 4 of the Clayton Act, foreign residents may bring a cause of action under the CEA. Our decision should not be interpreted as precluding foreigners from bringing such suits. We hold merely that a foreigner who trades exclusively

on a foreign exchange does not have standing under the Act.

**30.** 7 U.S.C.A. § 25(d) (CEA Section 22(d) states in relevant part:

the enactment of the Futures Trading Act of 1982 ... shall not affect any right of any parties which may exist with respect to causes of action accruing prior to such date.

**31.** 7 U.S.C.A. § 25 Private rights of action

(a) Actual damages; actionable transactions; exclusive remedy

(1) Any person (other than a contract market, clearing organization of a contract market, licensed board of trade, or registered futures association) who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in clauses (A) through (D) of this paragraph and caused by such violation to any other person—

(A) who received trading advice from such person for a fee;

(B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity); or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract;

(C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of—

(i) an option subject to section 6c of this title (other than an option purchased or sold on a contract market or other board of trade);

(ii) a contract subject to section 23 of this title; or

(iii) an interest or participation in a commodity pool; or

(D) who purchased or sold a contract referred to in clause (B) hereof if the violation constitutes a manipulation of the price of any such contract or the price of the commodity underlying such contract.

(2) Except as provided in subsection (b) of this section, the rights of action authorized by this subsection and by sections 7a(11), 18, and 21(b)(10) of this title be the exclusive remedies under this chapter available to any person who sustains loss as a result of any alleged violation of this chapter. Nothing in this subsection shall limit or abridge the rights of the parties to agree in advance of a dispute upon any forum for resolving claims under this section, including arbitration.

(b) Liabilities of organizations and individuals; bad faith requirement; exclusive remedy

(1)(A) A contract market or clearing organization of a contract market that fails to enforce any bylaw, rule, regulation, or resolution that it is required to enforce by section 7a(8) and (9) of this title, (B) a licensed board of trade that fails to enforce any bylaw, rule, regulation, or resolution that it is required to enforce by the Commission, or (C) any contract market, clearing organization of a contract market, or licensed board of trade that in enforcing any such bylaw, rule, regulation, or resolution violates this chapter or any Commission rule, regulation, or order shall be liable for actual damages sustained by a person who engaged in any transaction on or subject to the rules of such contract market or licensed board of trade to the extent of such person's actual losses that resulted from such transaction and were caused by such failure to enforce or enforcement of such bylaws, rules, regulations, or resolutions.

(2) A registered futures association that fails to enforce any bylaw or rule that is required under section 21 of this title or in enforcing any such bylaw or rule violates this chapter or any Commission rule, regulation, or order shall be liable for actual damages sustained by a person that engaged in any transaction specified in subsection (a) of this section to the extent of such person's actual losses that resulted from such transaction and were caused by such failure to enforce or enforcement of such bylaw or rule.

(3) Any individual who, in the capacity as an officer, director, governor, committee member, or employee of a contract market, clearing organization, licensed board of trade, or a registered futures association willfully aids, abets, counsels, induces, or procures any failure by any such entity to enforce (or any violation of the chapter in enforcing) any bylaw, rule, regulation, or resolution referred to in paragraph (1) or (2) of this subsection, shall be liable for actual damages sustained by a person who engaged in any transaction specified in subsection (a) of this section on, or subject to the rules of, such contract market, licensed board of trade or, in the case of an officer, director, governor, committee member, or employee of a registered futures association, any transaction specified in subsection (a) of this section, in either case to the extent of such person's actual losses that resulted from such transaction and were caused by such failure or violation.

(4) A person seeking to enforce liability under this section must establish that the contract market, licensed board of trade, clearing organization, registered futures association, officer, director, governor, committee member, or employee acted in bad faith in failing to take action or in taking such action as was taken, and that such failure or action caused the loss.

(5) The rights of action authorized by this subsection shall be the exclusive remedy under this chapter available to any person who sustains a loss as a result of (A) the alleged failure by a contract market, licensed board of trade, clearing organization, or registered futures association or by any officer, director, governor, committee member, or employee to enforce any bylaw, rule, regulation, or resolution referred to in paragraph (1) or (2) of this subsection, or (B) the taking of action in enforcing any bylaw, rule, regulation, or resolution referred to in this subsection that is alleged to have violated this chapter, or any Commission rule, regulation, or order.

(c) Jurisdiction

The United States district courts shall have exclusive jurisdiction of actions brought un-

action against certain individuals and against the exchanges. Section 22 has two substantive subsections. Subsection (b), which allows claims against the exchanges, plainly limits the private remedy to market traders. Subsection (a) provides for causes of action against non-exchange defendants. Although, arguably, the language in Section 22(a) is not as clearly restrictive as the language in subsection (b), the House Report indicates a congressional intent also to limit this right to market traders.

> The Committee is of the view that the right of an aggrieved person to sue a violator of the Act is critical to protecting the public and fundamental to maintaining the credibility of the futures market.

> To that end the Committee added a new section to the bill to provide specific authority for private rights of action for recovery of actual damages against violators of the Act. *In order to recover the violation must have arisen from a transaction on the futures market, a regulated option or leverage contract, or participation in a commodity pool.* H.R.Rep. No. 565, 97th Cong., 2nd Sess. 57, *reprinted in* 1982 U.S.CODE CONG. & AD.NEWS 3871, 3906. (Emphasis added.)

Congress also enacted a new CEA Section 4(b) in 1982, (quoted in the margin) [32] authorizing the CFTC to promulgate rules governing vendors of foreign futures contracts who are located in the United States. The purpose of the new section is clearly to protect American investors.[33] As the House report states:

> A number of futures markets exist abroad and others are now under development. Protection of United States residents solicited to trade on these foreign markets may necessitate regulation of those who vend foreign futures from domestic locations. It may prove desirable, for instance, to require such vendors to comply with some of the regulatory requirements now imposed on futures commission merchants marketing domestic futures. To make explicit the Commission's authority to prevent fraud *in the*

---

der this section. Any such action must be brought within two years after the date the cause of action accrued.

(d) Dates of application to actions

The provisions of this section shall become effective with respect to causes of action accruing on or after the date of enactment of the Futures Trading Act of 1982 [January 11, 1983]: *Provided,* That the enactment of the Futures Trading Act of 1982 shall not affect any right of any parties which may exist with respect to causes of action accruing prior to such date.

**32.** 7 U.S.C. § 6(b) (CEA Section 4(b)) provides:

(b) The Commission may adopt rules and regulations proscribing fraud and requiring minimum financial standards, the disclosure of risk, the filing of reports, the keeping of books and records, the safeguarding of customers' funds, and registration *with the Commission by any person located in the United States, its territories or possessions, who engages in the offer or sale of any contract of sale of a commodity for future delivery that is made or to be made on or subject to the rules of a board of trade, exchange, or market located outside the United States, its territories or possessions.* Such rules and regulations may impose different requirements for such persons depending upon the particular foreign

board of trade, exchange, or market involved. No rule or regulation may be adopted by the Commission under this subsection that (1) requires Commission approval of any contract, rule, regulation, or action of any foreign board of trade, exchange, or market, or clearinghouse for such board of trade, exchange, or market, or (2) governs in any way any rule or contract term or action of any foreign board of trade, exchange, or market, or clearinghouse for such board of trade, exchange, or market.

**33.** Prior to the enactment of CEA Section 4(b), (7 U.S.C. § 6(b)), the CFTC adopted Regulation 30.02, 17 C.F.R. § 30.02 (1984), which allows the CFTC to regulate against the perpetration of fraud on American consumers who purchase foreign commodities contracts. *See* II P. JOHNSON, *supra,* § 5.42 at p. 329 ("But American residents have been solicited to trade in foreign futures, principally in London. To fill this perceived regulatory gap, the Commission adopted Regulation § 30.02....") De Atucha argues he is covered by both CEA § 4(b) and Regulation § 30.02. However, de Atucha is not a United States citizen. Further, notwithstanding the fact that Merrill Lynch's principal office may be located in the United States, the fact remains that de Atucha purchased his LME contracts from Merrill Lynch in Argentina, which is not "located in the United States, its territories or possessions" as Section 4(b) requires.

*domestic offer and sale* of all future contracts, the Committee has included provisions that expressly authorize the Commission to develop, if needed, a regulatory system for those who market foreign futures from a domestic location. *Id.* at 3901–02, *accord id.* at 3934. (Emphasis added.)

In view of Congress' explicit recognition that the domestic offer and sale of foreign commodities contracts is within the scope of the CEA, its silence with respect to wholly foreign transactions is strong evidence that such transactions were not intended to be and are not regulated under the Act. *Cf. Sam Wong & Son, Inc. v. New York Mercantile Exchange,* 735 F.2d at 670. ("Here again the silence of the 1982 statute is evidence that Congress has no wish for a private cause of action for failure by an exchange to exercise its discretionary power to declare an emergency as soon as a plaintiff thinks it should.") Moreover, in addressing the issue of foreign regulation the record reveals that Congress struck a balance between protecting American interests on the one hand, and not alienating foreign interests to the detriment of the domestic economy. Notably, the issue arose in the context of a report on the Silver Crisis.

> [T]he Commission has under consideration various rules designed to address problems related to securing additional information of the futures accounts of foreign traders. During the silver episode, this problem arose in relation to the difficulties experienced by the Committee in obtaining reliable information on large silver futures positions held by certain foreign traders. Since effective enforcement of speculative position limits requires accurate and timely information pertaining to the accounts of both domestic and foreign traders, a clear need exists for changes in regulatory policy toward foreign accounts in this regard. However, the need for additional information must be weighed against potential adverse effects of regulatory action in this area, including potential negative market impacts associated with reduced foreign trader participation and the possibility of retaliation by foreign governments against U.S. traders. Accordingly, careful consideration of the available regulatory alternatives is still necessary before the Commission implements specific rules that address this problem.

H.R.Rep. No. 565, 97th Cong., 2nd Sess. 68, *reprinted in* 1982 U.S.CODE CONG. & AD.NEWS 3871, 3917. ("SILVER MARKET 1979–80").

Construing the statutes and the legislative history in light of the overall regulatory scheme we find that the reach of the CEA is limited to trading on United States exchanges and transactions involving foreign contracts when they are negotiated and/or consumated within "the United States, its territories or possessions ...". 7 U.S.C. § 6(b). Accordingly, de Atucha, an Argentinian resident who placed trades on the LME from a location in Argentina falls outside of the class of individuals who are protected by American commodities laws.[34]

---

**34.** De Atucha argues that he should not be barred from bringing an action under the CEA because it was Merrill Lynch, his broker, who made the decision to trade his commodities account on the LME rather than a United States exchange. Affidavits submitted in support and in opposition to the motion reveal there is a factual dispute as to (1) whether de Atucha's account was a "discretionary" one and (2) who made the decision to trade it on the LME. *Compare, e.g.,* Affidavit of Jose Maria Malbran (filed June 10, 1983) *with* Affidavit of Jorge M.C.C. de Atucha (filed June 22, 1983). Resolution of this dispute is not essential to disposal of the motion. Whether de Atucha specifically instructed Merrill Lynch to trade on the LME or whether he left the decision regarding which exchange to trade on to his broker's discretion does not alter the fact which we find dispositive, namely, that the market he ultimately traded on is one that is not regulated by the CEA. Moreover, we accept the proposition that one goal of strict regulation of United States commodities is to provide incentive to foreigners to trade here. *See Alpa S.A. Agroindustrial Alemano v. ACLI International Inc.,* 573 F.Supp. 1070, 1076 (S.D.N.Y. 1983) ("The way to encourage foreign traders to trade on the Chicago futures market, rather than on foreign markets, is to maintain a regulated market with standards of care imposed on commission merchants like ACLI as well as on

*Curran* does not suggest an opposite result.[35] After determining that Congress intended to preserve the preexisting remedy of an implied cause of action the Court focused on whether that remedy encompassed respondents' action. In deciding the issue reliance was placed upon "the law as it existed in 1974." Here, de Atucha has not pointed to, nor have we found, any pre-1974 decision in which an implied right was found in favor of foreigners engaging exclusively in foreign transactions. De Atucha correctly argues that the dearth of cases on point is not alone dispositive of the question and that the federal courts must decide questions left open by Congress. However, to extend the protection of the CEA to include de Atucha would expand the remedy beyond what we have concluded to be Congress' intent. Improvisation of such a remedy is not a proper function for the judiciary and must await such time, if any, as Congress sees fit to act.

Finally, de Atucha asserts that the Restatement, Second, Foreign Relations Law of the United States §§ 17 and 18 (1965) mandates that he be afforded relief. The defendants correctly answer that the question of jurisdiction, to which those sections of the Restatement relate, is distinct from the issue raised here, i.e., whether de Atucha has standing under the CEA. To the extent that standing and jurisdiction issues involve evaluation of the same statute and/or legislative history, the analyses of the issues may be similar.[36] Nonetheless, even if it were determined that we are empowered to hear plaintiff's claim, an issue we do not decide here, the conclusion that de Atucha has standing would not follow.

For the foregoing reasons the motions are granted. Further, since we hold that de Atucha does not have standing under the Clayton Act nor under the CEA, he is also barred from bringing such claims against the defendants who have not joined in the instant motion. Accordingly, the complaint is dismissed in its entirety.

It is so ordered.

the exchanges themselves. These standards should be applied as long as the actual trade is made on a United States exchange...." ) To allow recovery under the CEA based upon trading on foreign markets would eradicate this inducement to foreign traders. Moreover, it would be inconsistent with a congressional purpose of increased economic growth on United States commodities markets.

35. Nor, as plaintiff argues, does our decision in *Strax v. Commodity Exchange*, 524 F.Supp. 936 (S.D.N.Y.1981) (Lasker, J.) compel an opposite result. Although we left open the question as to whether a trader who trades on one United States exchange may hold both United States exchanges liable, *Id.* at 942 n. 13, *Strax* certainly did not hold that a foreign trader on a foreign exchange has standing under the CEA to sue the United States exchanges.

36. Although most of the cases upon which plaintiff relies discuss jurisdiction and not standing, to the extent that the decisions provide analogous authority we find them to support the conclusion that de Atucha lacks standing. For example, in *CFTC v. Muller*, 570 F.2d 1296 (5th Cir.1978), the Fifth Circuit relied upon a Second Circuit opinion, *British American Commodity Options Corp. v. Bagley*, 552 F.2d 482 (2d Cir.), *cert. denied*, 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977), to hold that the CFTC has jurisdiction to regulate the sale of London Commodity options sold in the United States, and in *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041 (2d Cir.1983), the Second Circuit recently held that trading on United States commodities markets was enough to sustain jurisdiction.