**Jorge M.C.C. de ATUCHA, Plaintiff,**

v.

**Nelson Bunker HUNT, William Herbert Hunt, Lamar Hunt, Bache Halsey Stuart Shields, Inc., Bache Group, Inc., Alvin Brodsky, Merrill Lynch, Pierce Fenner & Smith, Incorporated, Conticommodity Services, Inc., Norton Waltuch, Melvin Schnell, Defendants.**

**No. 82 Civ. 6546 (MEL).**

United States District Court,
S.D. New York.

Feb. 21, 1991.

---

Jared Stamell, Stamell Tabacco & Schager, New York City, for plaintiff.

Rogers & Wells, New York City, for defendant Merrill Lynch, Pierce Fenner & Smith, Inc.; William R. Glendon and Guy C. Quinlan, of counsel.

LASKER, District Judge.

This case arises from heavy losses Jorge M.C.C. de Atucha sustained on investments in long positions on silver futures contracts he purchased on the London Metals Exchange ("LME") in January, 1980. Extensive prior proceedings in this case,[1] with which familiarity is assumed, leave as the sole remaining issue to be resolved de Atucha's allegations of fraud and negligent misrepresentation by defendant Merrill Lynch, Pierce Fenner & Smith, Inc. ("Merrill Lynch") under New York, Argentine and British law. These allegations stem from Merrill Lynch's performance as de Atucha's broker when he purchased silver contracts through Merrill Lynch's Buenos Aires office on January 17, 1980.

Merrill Lynch moves for summary judgment on de Atucha's remaining fraud claims.

For de Atucha's claim to survive, he must point to triable issues of fact on all elements of the fraud claims he presents. Under New York law, de Atucha must make a prima facie showing of "representation of a material existing fact, falsity, scienter, deception and injury." *Lanzi v. Brooks*, 54 A.D.2d 1057, 388 N.Y.S.2d 946 (3d Dep't 1976), *aff'd* 43 N.Y.2d 778, 402 N.Y.S.2d 384, 373 N.E.2d 278 (1977).

De Atucha alleges that he was defrauded by Merrill Lynch in that: (1) de Atucha was a novice investor who made that fact known to Merrill Lynch when he announced to it his intention to invest in silver; (2) Merrill Lynch knew of a scheme by the Hunt brothers and others to inflate the silver market artificially, and knew that that scheme had already inflated silver prices above the economically warranted level, but represented (or did not deny) that existing silver prices resulted from "natural" economic forces; (3) Merrill Lynch intentionally made these misrepresentations because it had made substantial loans to the Hunts and knew itself to be at risk of substantial losses should the Hunts' market position become untenable, and accordingly believed it needed to encourage "innocent" investors to purchase silver contracts to support the inflated market price.

According to de Atucha's amended complaint, the central material fact which Merrill Lynch failed to disclose was the Hunt brothers' market manipulation scheme. Additionally, de Atucha alleges that Merrill Lynch made other material omissions or misrepresentations, including (1) its failure to inform de Atucha of the risks his investment presented, such as the potential for losses far in excess of his roughly $250,000 initial investment should the inflated price of silver collapse, and that under Merrill Lynch's own investment guidelines de Atucha's maximum advisable investment should have been $125,000; (2) its failure to

---

1. Previous rulings in this case are reported at 608 F.Supp. 510 (S.D.N.Y.1985) and 128 F.R.D. 187 (S.D.N.Y.1989).

disclose potential regulatory changes in the United States that would harm de Atucha's ability to trade his silver contracts; (3) its indication that silver contracts were unavailable on New York's Commodities Exchange ("Comex"), but that purchases on the LME were possible and were as desirable as Comex purchases when in fact the LME lacked regulatory protections which were in force on Comex; and (4) its representation that de Atucha would enjoy the protections of the Commodity Exchange Act ("CEA").

Merrill Lynch contends that de Atucha's deposition testimony establishes conclusively that he was not deceived by any of Merrill Lynch's representations or omissions since he knew the facts allegedly withheld, or establishes that Merrill Lynch in fact provided truthful information which de Atucha alleges was withheld. In particular, Merrill Lynch argues that the record conclusively shows that: (1) de Atucha knew of concerted buying activity by the Hunts and others, and decided to buy silver in an attempt to benefit from the rising prices which he believed would be associated with the Hunts' buying activity; (2) de Atucha merely indicated to Merrill Lynch his desire to purchase silver contracts, and in no way requested investment advice from Merrill Lynch; and (3) at the time he executed his silver contract, Merrill Lynch presented and de Atucha signed a "Risk Disclosure Statement" which among other things clearly states that investors in futures contracts risk losses in excess of their initial investment.

Merrill Lynch is correct that under New York law a plaintiff's actual knowledge of the allegedly misrepresented or omitted facts is fatal to his or her fraud claim. *See Rubenstein v. East River Tenants Corp.*, 139 A.D.2d 451, 527 N.Y.S.2d 29, 32 (1st Dep't 1988); *First National State Bank v. Irving Trust Co.*, 91 A.D.2d 543, 457 N.Y.S.2d 17, 19 (1st Dep't 1982), *aff'd* 59 N.Y.2d 991, 466 N.Y.S.2d 682, 453 N.E.2d 1099 (1983). Similarly, Argentine and British law require a showing of reliance as an element of a civil fraud claim, and provide that the plaintiff's independent knowledge of the misrepresented facts precludes re-

covery. *See* Cod.Civ. of Argentina, Art. 933; *Smith v. Chadwick*, 9 App.Cas. 185, 190 (1884). Accordingly, if the record sufficiently clearly indicates that de Atucha knew of the Hunts' market manipulation scheme, his allegation of Merrill Lynch's knowing failure to disclose that scheme to him will not support a finding of fraud.

De Atucha's deposition of August 23, 1989 contains the record's sole evidence of his knowledge of the Hunts' market manipulation scheme. De Atucha testified that he had been acquainted with Nelson Bunker Hunt, but had never discussed silver with him. He did testify, however, that at some time before January 1980 he read an article discussing large-scale silver purchases by Nelson Bunker Hunt. He recalled that the article stated "[t]hat Hunt had bought so much silver and was apparently buying silver, continued to buy silver, and it indicated the scale of his purchase." De Atucha testified that reading this article led him to consider investing in silver, and that his knowledge that Nelson Bunker Hunt was buying large quantities of silver "indicated that silver was a good investment."

De Atucha was asked, "Why did you reach that conclusion? Was it because you thought Mr. Hunt was a knowledgeable investor?" He answered, "Right." He then was asked, "And the fact that he was buying silver in a large scale was a positive fact about silver, as far as you were concerned?" Again, de Atucha replied, "Right."

De Atucha testified that more than a year passed from when he initially read the article concerning Hunt's silver purchases to when he purchased silver himself, during which he did not research commodities trading (with which he had had no experience and extremely limited knowledge) or the silver market other than reading occasional articles reporting similar accounts of intensive buying activity in the silver market.

He further testified that he was prompted to make his silver purchase several weeks before January 17, 1980 when "I

talked to a friend who had been in Mr. Naji Nahas' office in Brazil, and he told me that he thought that the Hunts, Mr. Naji Nahas and Arab investors were buying heavily, and that they had visualized a level for silver higher than what it had been in those days." De Atucha identified the friend as Jorge Tavares. De Atucha testified that his friend Tavares told de Atucha that Mr. Nahas had been buying commodities like silver intensively of late, and that Tavares expected this activity to continue; Tavares told de Atucha he believed the price of silver would rise to $80 to $90 per ounce "before leveling off." (The price then was roughly $50.) De Atucha testified Tavares said "[w]ords to the effect that this seemed to be a very serious operation involving the Arab royal family and members of the Arab royal family and so forth, and the Hunts."

When asked, "Did this conversation with Mr. Tavares cause you to think more favorably about the possibility of investing in silver?", de Atucha replied, "Yes." When asked, "And was that because Mr. Tavares told you that the Hunts and the Nahas and the Arab investors were buying silver on a large scale?", he replied, "Yes." De Atucha further agreed that he "regarded (this large scale buying) as a positive development for silver."

De Atucha testified that his final significant discussion [2] concerning silver prior to his actual purchase was with a cousin named Juan Bautista Pena, and occurred one to two days before his purchase. De Atucha told Pena that he intended to buy silver and advised him why he wanted to do so, and asked his cousin for advice concerning how to make a silver purchase. Pena advised him to make his purchase at Merrill Lynch's Buenos Aires office.

Based on de Atucha's testimony, it is beyond question that he knew of the intensive silver purchasing by the Hunts and others. Further, it is clear that his decision to invest was strongly influenced or even exclusively caused by his knowledge of the

Hunts' silver purchases and his conclusion, based on that knowledge, that silver investments would prove profitable.

The closer question is whether de Atucha knew of a scheme to manipulate the market and create an artificially high price, or whether he merely believed the Hunts' intensive buying indicated that silver was underpriced and would yield substantial profits as the market developed naturally.

At this stage in the proceedings, Merrill Lynch has not made a strong enough showing to justify summary judgment in its favor on the basis of de Atucha's knowledge. De Atucha's testimony does strongly suggest that he understood the Hunts were engaged in market manipulation, and that he intended to profit from it. However, a reading of his comments as innocent is also possible. His statement that the large-scale silver investors "visualized a level for silver higher than what it had been" is compatible with a simple belief that the market undervalued silver as opposed to an understanding of a market manipulation scheme, as are his various comments to the effect that he believed the Hunts' buying activities were "a positive development for silver."

The closest de Atucha came to expressing knowledge of a market manipulation scheme is his description of Tavares' account of the buying operations of the Hunts and others as "[w]ords to the effect that this seemed to be a very serious operation involving the Arab royal family and so forth, and the Hunts." Merrill Lynch makes much of the term "serious operation." Again, however, the description of recent buying as a "serious operation," while quite possibly depicting a market manipulation scheme, also plausibly could indicate that the Hunts and others strongly believed silver prices would rise regardless of their activity, and invested accordingly. De Atucha's investment thus could be seen by a reasonable jury as resulting from his naive belief that he should invest in the same way as sophisticated investors like

---

**2.** De Atucha testified that he also "may have talked about it with my accountant," a Mr. Lopez Castro, but he does not recall the content of that conversation, and has no recollection of having received Lopez Castro's opinion about an investment in silver.

the Hunts, rather than from an attempt to reap profits from the market manipulation scheme he now alleges.

The finding that the record as it stands does not establish conclusively that de Atucha knew of the market manipulation scheme before he made his investment is fatal to Merrill Lynch's motion for summary judgment, the central premise of which is that de Atucha could not have relied on any omission or misrepresentation of information because he already knew it. *See Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 57 (2d Cir. 1987) ("not only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from them").

It is not clear whether Merrill Lynch's motion raises certain subordinate issues to obtain summary judgment as to those issues, or merely is attempting to bolster its motion for summary judgment on the dispositive question of de Atucha's knowledge of the alleged market manipulation scheme. Assuming the former, our comments are as follows.

1) Merrill Lynch correctly claims that the record as it stands leaves no viable dispute as to Merrill Lynch's disclosure that de Atucha's investment exposed him to potential losses beyond the amount of his initial investment. De Atucha signed a "Risk Disclosure Statement" at the time he purchased his silver position which stated:

> You may sustain a total loss of the initial margin funds and any additional margin funds that you deposit with your broker. If the market moves against your position, you may be called upon by your broker to deposit a substantial amount of additional margin funds, on short notice.... If you do not provide the required fund within the prescribed time, your position may be liquidated at a loss, and you will be liable for any resulting deficit in your account.

Further, the Commodity Account Agreement provided that "because of the low margin normally required in commodities futures trading, price changes in commodity futures contracts may result in signifi-

cant losses, which losses may exceed your margin deposit." De Atucha testified that his best recollection is that he read these documents with some care prior to signing them, and that he signed them when making his initial silver contracts purchase in Merrill Lynch's Buenos Aires office. De Atucha further testified that he was aware of no affirmative representation or implication by Merrill Lynch that his potential losses would be limited to amount of his initial investment, and he testified that when he placed his order he merely stated his desire to purchase silver contracts, and that Merrill Lynch placed his order without offering substantive advice.

De Atucha's testimony on this point, combined with the clear cautionary statements which Merrill Lynch provided him and which he signed to acknowledge having read prior to his execution of his silver contract order, conclusively indicate that Merrill Lynch neither expressly denied nor concealed from de Atucha the risks of his investment. Accordingly, no evidence may be presented at trial as to Merrill Lynch's alleged failure to provide such information to de Atucha.

2) Merrill Lynch contends de Atucha's deposition contradicts his claim that Merrill Lynch failed to explain the term "limit-up" to him. De Atucha in his deposition did acknowledge receiving an explanation from Merrill Lynch of that term, but could not remember what he was told. Accordingly, de Atucha may not now claim that Merrill Lynch failed to discuss the term with him, but evidence may be presented by either party concerning the substance of Merrill Lynch's representation to him.

3) As to de Atucha's ability to limit his losses through liquidation after his initial purchase, de Atucha stated in his deposition that he never asked Merrill Lynch for advice as to whether he should liquidate his position, which will preclude a contrary contention at trial.

4) Merrill Lynch correctly contends that de Atucha's deposition conclusively indicates that he did not request any form of counseling from Merrill Lynch at the time he purchased his silver contracts. He re-

peatedly stated that he did not seek Merrill Lynch's advice concerning possible silver purchases or any other form of investment. Accordingly, at trial de Atucha is foreclosed from maintaining that he actively sought Merrill Lynch's advice and was misled as a result.

5) The record has not been sufficiently developed to support summary judgment concerning de Atucha's allegations that Merrill Lynch furthered a fraudulent scheme by failing to disclose information concerning possible changes in exchange rules and regulations, as well as concerning the possible differences between trades on the LME and trades on the Comex. While Merrill Lynch argues that no fiduciary duty exists requiring it to reveal such information to purchasers who do not seek investment advice, that argument does not respond to de Atucha's allegation of Merrill Lynch's involvement in a scheme to manipulate the market.

Merrill Lynch's motion for summary judgment is denied as to de Atucha's knowledge of the alleged market manipulation scheme, but is granted as to certain subsidiary issues as discussed above.

It is so ordered.